600 S.E.2d 346

**David M. JACKSON, Plaintiff Below, Appellee**

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Defendant Below, Appellant.**

**No. 31372.**

Supreme Court of Appeals of West Virginia.

Submitted March 30, 2004.

Decided July 2, 2004.

---

Davis, J., concurred and filed separate opinion.

Maynard, C.J., concurred in part, dissented in part, and filed separate opinion.

McGraw, J., concurred and filed separate opinion.

Jason A. Cuomo, Esq., Frank Cuomo, Esq., Cuomo & Cuomo, Wellsburg, West Virginia, Attorneys for Appellee.

Catherine D. Munster, Esq., Tiffany R. Durst, Esq., James A. Varner, Esq., McNeer, Highland, McMunn & Varner, Clarksburg, West Virginia, Attorneys for Appellant.

STARCHER, Justice:

This opinion addresses two separate appeals from the Circuit Court of Brooke County, from the same case. The two appeals have been consolidated for review. In the first case, appellant State Farm Mutual Automobile Insurance Company ("State Farm") appeals an April 24, 2002 order that granted summary judgment to the appellee, David M. Jackson, on two issues in Mr. Jackson's third-party statutory unfair claim settlement practices lawsuit against State Farm, and that denied State Farm's motion for summary judgment. For the reasons which follow, we affirm the circuit court's decision to deny State Farm's motion for summary judgment, reverse the circuit court's decision to grant Mr. Jackson's motion for summary judgment, and remand the case for further proceedings.

In the second case, appellant State Farm appeals a January 29, 2003 order that denied State Farm's motion for a new trial, in connection with Mr. Jackson's jury verdict against State Farm on the issue of whether State Farm's alleged unfair settlement practices constituted a general business practice. For the reasons that follow, we reverse and remand the case for a new trial.

## I.

### Facts & Background

On May 16, 1996, a vehicle driven by the appellee and plaintiff below, David M. Jackson, was struck in the rear by a vehicle driven by Teri Smoot. At the time of the accident, Mr. Jackson either had substantially slowed or stopped his vehicle on the roadway, or partially on the roadway, on the other side of a crest or rise in the road in order to offer a ride to a pedestrian, Joseph Gonzales. Mr. Jackson was seriously injured in the collision, and his car was severely damaged. Mr. Jackson immediately filed a claim with Ms. Smoot's liability insurance company, the appellant and defendant below, State Farm.

State Farm, through a claims representative, Jim Kays, conducted an investigation of Mr. Jackson's claim. During the course of the investigation, Mr. Kays drove over the crest of the hill where the accident occurred a number of times and attempted to recreate the accident. However, Mr. Kays did not take any measurements of the accident scene, other than to approximate the length of skid marks made by Ms. Smoot's vehicle. Further, State Farm did not obtain a copy of the police report of the accident, and did not retain the services of an expert to examine the accident scene or to otherwise determine the cause of the accident. State Farm also did not take a recorded statement of the independent witness to the accident, Mr. Gonzales.

Based upon his investigation, State Farm's investigator, Mr. Kays, concluded that Mr. Jackson was 100% at fault, and that State Farm's insured, Ms. Smoot, was not liable for the collision. Mr. Kays determined that Mr. Jackson had improperly stopped his vehicle on a public highway, and that his stopped vehicle was not visible to Ms. Smoot as she approached the crest of the hill. Accordingly, on May 21, 1996, five days after the accident, State Farm notified Mr. Jackson that it was denying his claims arising from the accident.

On April 30, 1998, Mr. Jackson filed a negligence action against Ms. Smoot. Contemporaneously, Mr. Jackson filed lawsuit against State Farm, alleging that State Farm had illegally engaged in unfair claim settlement practices in violation of the West Virginia Unfair Trade Practices Act, *W.Va.Code*, 33–11–4(9)(f), which prohibits "[n]ot attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear."

Prior to the suit being filed, State Farm had calculated that the appellee's fault for the collision was 100%, and Ms. Smoot's fault was 0%. Subsequent to the suit's filing, a claims manager for State Farm, Mary Adkins, calculated that Ms. Smoot's fault was as high as 49%. A writing reflecting this assessment is contained in the claim file.

On August 3, 1999, Mr. Jackson offered to settle his claims for $35,000.00, but State Farm rejected the offer. Then, by a letter dated August 11, 1999, from the defense attorneys employed by State Farm to repre-

sent Ms. Smoot, State Farm learned that at the time of the accident, a portion of Mr. Jackson's vehicle was visible to Ms. Smoot prior to her arrival at the rise in the road. This assessment was contrary to the assessment made by Mr. Kays.

It was not until November 15, 1999, that a State Farm section manager, Don Dooley—who was also the boss of claims manager Mary Adkins—examined the claim file. Mr. Dooley assessed the relative degrees of fault of the parties, and handwritten notes in the claim file indicate that he believed that Ms. Smoot's fault was as high as 60%; that the appellee's damages were between $12,500.00 and $17,500.00; and that State Farm should make an offer as high as $10,500.00. Ms. Adkins later testified that, despite Mr. Dooley's assessment, she had no intentions of making any settlement offers to the appellee.

On January 30, 2001, State Farm made two separate offers of settlement—$10,500.00 and $15,000.00, both of which Mr. Jackson rejected. As a result, the personal injury action was tried before a jury between February 5 and 7, 2001. The jury assessed 90% of the negligence against Ms. Smoot, and 10% against Mr. Jackson and awarded Mr. Jackson $73,288.36 in damages.

Subsequently, Mr. Jackson amended his complaint against State Farm to include allegations of additional unfair claim settlement practices in violation of *W.Va.Code*, 33–11–4(9)(d) which prohibits "[r]efusing to pay claims without conducting a reasonable investigation based upon all available information."[1]

After substantial discovery, the parties filed motions for summary judgment. By an order dated April 24, 2002, the circuit court granted Mr. Jackson's motion for summary judgment on the issues of State Farm's alleged violation of *W.Va.Code*, 33–11–4(9)(d) and (f). The circuit court concluded, as a matter of law, that State Farm had failed to conduct a reasonable investigation based upon all available information, and that State Farm did not attempt in good faith to effectuate a prompt, fair, and equitable settlement after liability became reasonably clear. In the same order, the circuit court denied State Farm's motion for summary judgment.[2]

Mr. Jackson's unfair settlement practices claims against State Farm ultimately went to trial on the questions of whether State Farm's violations of *W.Va.Code*, 33–11–4(9) constituted a general business practice[3] under the statute, and whether punitive damages should be awarded. At the conclusion of the trial, which was conducted from May 28, 2002 through May 31, 2002, and June 4, 2002 through June 6, 2002, the jury answered both questions in the affirmative. The jury awarded Mr. Jackson $39,000.00 in damages for attorney fees and costs and $50,000.00 in damages for annoyance and inconvenience. The jury also assessed punitive damages against State Farm in the amount of $1,250,000.00. In an order dated January 29, 2003, the circuit court denied State Farm's motions for a new trial.

State Farm now appeals the circuit court's April 24, 2002 order granting summary judgment on Mr. Jackson's behalf. State Farm also appeals the circuit court's January 29, 2003 order denying State Farm's post-trial motions.

---

1. Mr. Jackson also alleged a violation of *W.Va. Code*, 33–11–4(9)(g), but the circuit court dismissed this claim after finding that subpart (g) applies only to first-party claims.

2. On May 13, 2002, State Farm filed a petition for appeal of the circuit court's summary judgment order with this Court, and moved to stay the underlying proceedings pending resolution of the appellate proceedings. By an order dated May 23, 2002, this Court refused the motion for a stay of proceedings with leave to appeal the circuit court's April 24, 2002 order, incident to any petition for appeal of a final judgment once entered.

3. This Court has held that "[m]ore than a single isolated violation of W.Va.Code, 33–11–4(9), must be shown in order to meet the statutory requirement of an indication of 'a general business practice,' which requirement must be shown in order to maintain the statutory implied cause of action." Syllabus Point 3, *Jenkins v. J.C. Penney Casualty Insurance Company*, 167 W.Va. 597, 280 S.E.2d 252 (1981), *overruled on other grounds by State ex rel. State Farm Fire & Cas. Co. v. Madden*, 192 W.Va. 155, 451 S.E.2d 721 (1994).

## II.

### Standard of Review

State Farm asserts that the circuit court erred both in denying its motion for summary judgment and in granting Mr. Jackson's motion for summary judgment. Our review of these issues is *de novo.* Syllabus Point 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994) ("A circuit court's entry of summary judgment is reviewed *de novo.*").

## III.

### Discussion

### A.

### Summary Judgment Order

Critical to the circuit court's summary judgment on behalf of Mr. Jackson was its conclusion of law as to the definition of the words "reasonably clear" contained in *W.Va. Code,* 33–11–4(9)(f), which states:

No person shall commit or perform with such frequency as to indicate a general business practice any of the following ... Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear[.]

According to the circuit court, "[l]iability is reasonably clear when a reasonable person with knowledge of the relevant facts and law would have concluded[,] that it was more likely than not that the insured ... was more than 50% at fault for the accident."

■ This Court has not previously addressed the meaning of "reasonably clear" as used in *W.Va.Code,* 33–11–9(f). Concerning our construction of statutory terms, we have said that "[i]n the absence of any definition of the intended meaning of words or terms used in a legislative enactment, they will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which they are used." Syllabus Point 1, *Miners in Gen. Group v. Hix,* 123 W.Va. 637, 17 S.E.2d 810 (1941), *overruled on other grounds by Lee–Norse Co. v. Rutledge,* 170 W.Va. 162, 291 S.E.2d 477 (1982).

Based upon our determination of the commonly accepted meaning of "reasonably clear," we believe that it means something more than the circuit court's definition of "more likely than not." The word "clear" ordinarily is defined as "evident" or "plain." *Random House Webster's Unabridged Dictionary* 383 (2nd ed.1998). According to *Black's Law Dictionary* 227 (5th ed.1979), "clear" means "[o]bvious... [p]lain, evident, free from doubt or conjecture[.]" Consistent with this definition of "clear" is its meaning in our standard of proof known as "clear and convincing evidence." This standard means "[e]vidence indicating that the thing to be proved is highly probable or reasonably certain. This is a greater burden than preponderance of the evidence[.]" *Black's Law Dictionary* 457.

The circuit court's construction of "clear," however, conforms to the commonly accepted meaning of "preponderance of the evidence" which is "more likely than not." As indicated above, this is a lesser standard than "clear and convincing." *See Hovermale v. Berkeley Springs Moose Lodge No. 1483,* 165 W.Va. 689, 697 n. 4, 271 S.E.2d 335, 341 n. 4 (1980) (stating that "[p]roof by a preponderance of the evidence requires only that a party satisfy the court or jury by sufficient evidence that the existence of a fact is more probable or likely than its nonexistence.").

In addition, other courts have construed the words "reasonably clear" in an unfair trade practice statute to demand some degree of certainty. In *American Universal Ins. Co. v. Medical Malpractice Joint Underwriting Ass'n of Mass.,* 1993 WL 818614 \*22 (Mass.Super.1993), the court reasoned:

"Reasonably *clear*" seems to call for a higher level of certainty than "reasonably *likely*" would. The legislative choice of the word "clear" seems to suggest that the matter has reached a point where reasonable minds could not honestly differ. Liability need not be absolutely certain, or beyond reasonable doubt, but it must be "clear" enough that reasonable people would agree about it. Put conversely, if there is room for objectively reasonable debate about whether liability exists, then it is not "reasonably clear."

In *Demeo v. State Farm Mut. Auto. Ins. Co.,* 38 Mass.App.Ct. 955, 649 N.E.2d 803 (1995),

the court found that "reasonably clear" means that a "reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insurer was liable to the plaintiff."

■ Based on the reasoning above, we now hold that liability is "reasonably clear," as stated in *W.Va.Code*, 33–11–4(9)(f) [2002], when a reasonable person, with knowledge of the relevant facts and law, would conclude, for good reason, that the defendant is liable to the plaintiff.

■ We have thus far determined that the circuit court used the wrong legal standard in determining whether liability was reasonably clear pursuant to *W.Va.Code*, 33–11–4(9)(f). We also believe that the circuit court erred in determining as a matter of law an issue that is generally a jury question. *See Pena v. State Farm Lloyds*, 980 S.W.2d 949, 955 (Tex.Ct.App.1998) (holding that "[w]hether an insurer acted in bad faith because it denied or delayed payment of a claim after its liability became reasonably clear is . . . a question for the fact finder"); *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 56 (Tex. 1997) (ruling that "whether an insurer acted in bad faith because it denied or delayed payment of a claim after its liability became reasonably clear is a question for the factfinder"); *Financial Review Services, Inc. v. Prudential*, 50 S.W.3d 495, 504 n. 6 (Tex.Ct. App.1998), *affirmed by* 29 S.W.3d 74 (Tex. 2000) (noting that "[w]hether an insurer acted in bad faith because it denied or delayed payment of a claim after its liability became reasonably clear is a fact question" (citation omitted)). In Syllabus Point 2 of *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329 (1995), we held, in part, that "[s]ummary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party[.]" We explained in *Williams* that:

> In assessing the factual record, we must grant the nonmoving party the benefit of inferences, as "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Anderson* [*v. Liberty Lobby,*

*Inc.,*] 477 U.S. [242] at 255, 106 S.Ct. [2505] at 2513, 91 L.Ed.2d [202] at 216. Summary judgment should be denied "even where there is no dispute as to the evidentiary facts in the case but only as to the conclusions to be drawn therefrom" *Pierce v. Ford Motor Co.*, 190 F.2d 910, 915 (4th Cir.), *cert. denied*, 342 U.S. 887, 72 S.Ct. 178, 96 L.Ed. 666 (1951).

194 W.Va. at 59, 459 S.E.2d at 336. In the instant case, we believe that a reasonable jury could draw different conclusions on the issue of whether State Farm's insured's liability was reasonably clear.

■ For the same reason, we find that the circuit court erred in ruling as a matter of law that State Farm failed to conduct a reasonable investigation pursuant to *W.Va. Code*, 33–11–4(9)(d). Again, the reasonableness of an insurer's investigation is a jury question because jurors can often draw different conclusions from the evidence. *See Bobick v. U.S. Fidelity & Guar. Ins. Co.*, 57 Mass.App.Ct. 1, 3–4, 781 N.E.2d 8, 10 (2003), *affirmed by* 439 Mass. 652, 790 N.E.2d 653 (Mass.2003) (determining that "[w]hether an insurer has conducted an adequate investigation before denying a claim, whether liability has become reasonably clear, and whether a settlement offer is reasonable are factual determinations" (citations omitted)). Accordingly, we hold that whether an insurer refused to pay a claim without conducting a reasonable investigation based upon all available information under *W.Va.Code*, 33–11–4(9)(d) [2002] and whether liability is reasonably clear under *W.Va.Code*, 33–11–4(9)(f) [2002] ordinarily are questions of fact for the jury.

■ We further find that the circuit court's conclusion that "[l]iability against State Farm's insured was reasonably clear at least as of the time the jury returned its verdict on February 7, 2001" was error. The fact that a jury finds an insured liable after the insurer contested liability simply is not dispositive of the question whether liability was reasonably clear. We agree with the reasoning of the Massachusetts appellate court in *Bolden v. O'Connor Café of Worcester, Inc.*, 50 Mass.App.Ct. 56, 734 N.E.2d 726

(2000). In *Bolden*, the plaintiff in a dramshop case obtained a jury verdict in her favor. She then settled with the defendant dram shop and received an assignment of the defendant's claim against its liability insurer. The plaintiff and defendant then sought to dismiss the defendant's appeal in the dram shop trial verdict, but the defendant's liability insurer sought to intervene to prosecute the appeal, arguing that in a separate unfair claims practices suit, it would be unable to reopen the issue of the defendant-insured's liability. The appellate court affirmed the trial judge's denial of the insurer's motion to intervene.

The appellate court first characterized the insurer's argument as follows:

> Were the [insurer] able to appeal successfully, the argument goes, with the result that [insured] was no longer liable, then the [insurer] would be home free in the . . . lawsuit it faces for unfair settlement practices. The [insurer] explains it thus: it could not be faulted in the [unfair settlement practices] case for not having made fair offers in the tort case once [insured's] liability became reasonably clear because [insured] never was liable at all and its liability, accordingly, could never have been reasonably clear.

50 Mass.App.Ct. at 63, 734 N.E.2d at 732 (footnote and citation omitted). In rejecting this argument, the court explained:

> The issues to be determined in the [unfair settlement practices] claim do not in fact concern [defendant-insured's] actual liability. The [insurer's] settlement practices could be entirely without fault and the [insurer] accordingly immune from [unfair settlement practices] liability, yet the dramshop jury could still have found [defendant-insureds] liable for dramshop liability. The [insurer] need not show at the [unfair settlement practices] trial that [defendant-insured] was without fault. What the [insurer] must instead do there is show that its settlement offers in the dramshop case were reasonable and made in good faith, given its own knowledge at the time of the relevant facts and law concerning the [plaintiffs'] claim. The resolution of the [unfair settlement practices]
> claim, including the issue of bad faith, will depend upon a factual determination of the [insurer's] knowledge and intent. Accordingly, the [insurer] will not need to attack collaterally the dramshop liability judgment in order to prove in the [unfair settlement practices] case that [defendant-insured] was not actually liable and therefore that the [insurer] is also not liable for unfair settlement practices. Rather, the [insurer] need only demonstrate that [defendant-insured's] liability was not "reasonably clear" to the [insured], *not* to the jury that heard the dramshop liability case.

> Otherwise put, notwithstanding what the dramshop liability jury concluded about [defendant-insured's] liability, what matters in the [unfair settlement practices] case is whether the [insured] reasonably believed that [defendant-insured's] liability was not clear, or was unreasonable in holding that belief. "So long as the insurer acts in good faith, the insurer is not held to standards of omniscience or perfection; it has leeway to use, and should consistently employ, its honest business judgment." *Peckham v. Continental Cas. Ins. Co.*, 895 F.2d 830, 835 (1st Cir.1990). Because [defendant-insured's] actual liability will not be "retried" in the [unfair settlement practices] suit, we conclude that the [insurer] will be able to defend itself without impairment on the relevant issues in the [unfair settlement practices] suit.

50 Mass.App.Ct. at 66–67, 734 N.E.2d at 734–35 (footnotes and citations omitted).

█ Accordingly, we hold that a trial verdict in which a defendant is found liable to a plaintiff for personal injuries or property damage suffered by the plaintiff is not dispositive of the issues raised in an unfair settlement practices claim brought by the plaintiff against the defendant's liability insurer pursuant to the *W.Va.Code,* 33–11–4(9) [2002], in which the plaintiff alleges that the defendant's liability insurer unreasonably failed to settle the plaintiff's claims against the defendant.

In sum, in the instant case, the circuit court used the wrong legal standard and improperly decided as a matter of law that

liability was reasonably clear when this was an issue for the jury. The circuit court also improperly decided as a matter of law the issue of whether State Farm failed to conduct a reasonable investigation. Finally, the circuit court erred in placing too much weight on Mr. Jackson's jury verdict against Ms. Smoot in the underlying negligence action in determining that liability was reasonably clear. Therefore, we find that the circuit court erred in granting summary judgment to Mr. Jackson on his claims under *W.Va.Code*, 33–11–4(9)(d) and (f), and we reverse and remand that portion of the circuit court's April 24, 2002 order.

However, we find that the circuit court properly denied State Farm's motion for summary judgment. Again, the facts of this case indicate that it is not susceptible to a summary judgment on behalf of either party on the issues of whether State Farm conducted a reasonable investigation and whether liability was reasonably clear. Instead, these are issues which must be decided by a jury under the specific facts of this case. Accordingly, we affirm the circuit court's April 24, 2002 order to the extent that it denied State Farm's motion for summary judgment.

### B. *Trial Issues*

State Farm raises several alleged errors in the unfair settlement practices trial which may again become issues on remand, and we find it necessary to address these alleged errors.

■ First, State Farm alleges error concerning the testimony of Mr. Jackson's expert witness, Roger Diaz. Initially, we note that "[t]he admissibility of testimony by an expert witness is a matter within the sound discretion of the circuit court, and the circuit court's decision will not be reversed unless it is clearly wrong." Syllabus Point 6, *Helmick v. Potomac Edison Co.*, 185 W.Va. 269, 406 S.E.2d 700 (1991).

The circuit court qualified Mr. Diaz as an expert in the areas of claims handling, adjustment, and management, and State Farm has no objection to these qualifications. However, Mr. Diaz also was qualified by the circuit court to testify on the application of the Unfair Claim Settlement Practices Act, what constitutes a general business practice under the Act, and actual malice. As a result of his qualification in the latter three areas, Mr. Diaz was permitted to testify that State Farm committed multiple violations of the Act and that it did so maliciously. To this State Farm objects.

We agree with State Farm that the circuit court abused its discretion in permitting Mr. Diaz to testify as an expert on the application of the Unfair Claim Settlement Practices Act, what constitutes a general business practice under the Act, and actual malice.

As a general rule, an expert witness may not give his [or her] opinion on a question of domestic law [as opposed to foreign law] or on matters which involve questions of law, and an expert witness cannot instruct the court with respect to the applicable law of the case, or infringe on the judge's role to instruct the jury on the law. So an expert may not testify as to such questions of law as the interpretation of a statute . . . or case law . . . or the meaning of terms in a statute . . . or the legality of conduct.

32 C.J.S. *Evidence* § 634, at 503–04 (1996) (footnotes omitted). *See also* John W.Strong, *McCormick On Evidence*, Vol. 1 § 12, p. 53 (1999) (stating that "[r]egardless of the rule concerning admissibility of opinion upon ultimate facts, at common law[,] courts do not allow opinion on a question of law, unless the issue concerns foreign law." (Footnotes omitted.)).

However, the statement in 32 C.J.S. *Evidence* § 634, that the general rule provides that an expert witness is not permitted to state a legal conclusion, it is modified somewhat if the legal issue is raised in such a way as to become a necessary operative fact. *See Terrell v. Reinecker*, 482 N.W.2d 428, 430 (1992). Furthermore, an expert witness "may properly state an opinion on an issue of fact, and may be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms." 32 C.J.S. *Evidence* § 634, at 506.

■ Also, according to Rule 704 of the West Virginia Rules of Evidence, "[t]estimo-

ny in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." This Court has stated that "[t]his rule is applicable both to lay and expert witnesses. Based on the clear import of this rule, a motion made solely on the basis that such testimony involves the ultimate issue is meritless. Instead, the point to focus on is whether an opinion is 'otherwise admissible.' " *Jones v. Garnes,* 183 W.Va. 304, 306, 395 S.E.2d 548, 550 (1990). Testimony concerning the applicable law would not be otherwise admissible under W.Va.R.Evid. 702 which permits expert testimony that "will assist the trier of fact to understand the evidence or to determine a fact in issue." This is because testimony on the applicable law does not assist the jury in determining a *fact* in issue nor does it assist the jury in understanding the evidence.

 Finally, expert testimony concerning the applicable law is not otherwise admissible because it is superfluous. "It is a general rule of law that it is the duty of the jury to take the law from the court and to apply that law to the facts as it finds them from the evidence. The [jury] instructions are the law of the case." *Nesbitt v. Flaccus,* 149 W.Va. 65, 77, 138 S.E.2d 859, 867 (1964) (citation omitted).

> The trial judge is the "sole source of the law," and witnesses should not be allowed to testify on the status of the law, just as counsel are forbidden to argue law to jurors. Hearing statements of "the law" from several sources would not be helpful to jurors.
>
> . . .
>
> . . . [A]n expert's testimony is proper under Rules 702 and 704 if the expert does not attempt to define the legal parameters within which the jury must exercise its fact-finding function. However, when the purpose of testimony is to direct the jury's understanding to the legal standards upon which their verdict must be based, the testimony should not be allowed. A witness, expert or non-expert, should not be allowed to define the law of the case.

Indeed, it is black-letter law that it is not for witnesses but for the judge to instruct the jury as to applicable principles of law. In our legal system, purely legal questions and instructions to the jury on the law to be applied to the resolution of the dispute before them is exclusively the domain of the judge. The danger is that the jury may think that the "expert" in the particular branch of the law knows more than the judge—surely an impermissible inference in our system of law.

Because the jury does not decide such pure questions of law, such testimony is not helpful to the jury and so does not fall within the literal terms of Rule 702[.]

2 Franklin D. Cleckley, *Handbook On Evidence For West Virginia Lawyers* § 7–4(B), pp. 7–78—7–79 (2000).

 Accordingly, we now hold that as a general rule, an expert witness may not give his or her opinion on the interpretation of the law as set forth in *W.Va.Code,* 33–11–4(9)(a)—(*o*) [2002], which defines unfair claim settlement practices; the legal meaning of terms within that code section; or whether a party committed an unfair claim settlement practice as defined in that *Code* section. Rather, it is the role of the trial judge to instruct the jury on the law. Based on this rule, we believe that it was clearly wrong for the circuit court to permit Mr. Diaz to testify that State Farm's actions violated the Unfair Claim Settlement Practices Act or that its actions constituted a "general business practice" under the Act. While Mr. Diaz may testify to ordinary practices of claims adjustment and settlement within the insurance industry, and whether State Farm's conduct in the instant case conformed to those ordinary practices, he may not testify as to the legal consequences of that conduct.

 We also find that it was improper for Mr. Diaz to testify that the conduct of State Farm's agents and employees indicated the existence of actual malice. Again, this testimony is not necessarily inadmissible under Rule 704 which permits testimony on an ultimate issue to be decided by the jury. However, the testimony *is* inadmissible under Rule 702 simply because it does not assist the trier of fact to understand the

evidence or to determine a fact in issue. After the jurors are informed of industry practices of claims adjustment and settlement, the nature of State Farm's conduct in the instant case, and the applicable law concerning malice, they are as capable as Mr. Diaz to determine whether State Farm's conduct indicates the existence of malice. Therefore, Mr. Diaz's opinion on this issue does not assist the jury but rather is merely cumulative. Further, because Mr. Diaz has been recognized as an expert, there is a danger that jurors may consider him more qualified to determine the issue of malice than they are.

The second issue raised by State Farm is that the circuit court erred in refusing to allow State Farm's counsel to make full inquiry of Mr. Diaz regarding his lack of statistical data to support his opinion that State Farm violated the Unfair Claim Settlement Practices Act as a general business practice. We find no merit to this alleged error.

A rule of this Court is that "[t]he extent of the cross-examination of a witness is a matter within the sound discretion of the circuit court; and in the exercise of such discretion, in excluding or permitting questions on cross-examination, its action is not reviewable except in case of manifest abuse or injustice." Syllabus Point 4, *State v. Carduff*, 142 W.Va. 18, 93 S.E.2d 502 (1956). Moreover, "[t]he right of cross-examination is not an unlimited one and it is subject to the discretionary power of a circuit court to restrict or limit such cross-examination where it is justified." Syllabus Point 5, *State v. Hankish*, 147 W.Va. 123, 126 S.E.2d 42 (1962). In its decision to restrict or limit cross-examination, the circuit court may consider such factors as "the importance of the evidence to the [party's] case, [its] relevance . . . and the danger of prejudice, confusion, or delay raised by the evidence sought to be adduced." *State v. Bradshaw*, 193 W.Va. 519, 541, 457 S.E.2d 456, 478 (1995).

During the direct examination of Mr. Diaz, he testified of several specific cases to show that State Farm's alleged unfair settlement practices in Mr. Jackson's claim constituted a general business practice. On cross-examination, State Farm's counsel elicited testimony from Mr. Diaz that he did not know how many claims State Farm handles in a year in its Wheeling office, its Maryland office, in West Virginia, in the Eastern Seaboard region, and in the entire United States. State Farm's counsel also elicited testimony from Mr. Diaz that he had not conducted a statistical analysis to determine how many "number of claims it would take to be measured against the number of violations of an act before it becomes statistically valid."

This Court has not indicated that a statistical analysis is necessary to prove a general business practice under *W.Va.Code*, 33–11–4(9). In *Dodrill v. Nationwide Mutual Ins. Co.*, 201 W.Va. 1, 491 S.E.2d 1 (1996), we discussed the evidence necessary to show a general business practice as follows:

> We perceive that the discussion of a "general business practice" in our past cases has generally addressed the question in terms of numbers, e.g., the number of claims in which the same practice has been used, the number of violations of *W.Va. Code*, 33–11–4(9) shown by the evidence, and the number of scenarios. . . . [T]hose cases make clear that the employment of a single, particular forbidden practice in the handling of several claims can define a general business practice[.]

201 W.Va. at 13, 491 S.E.2d at 13. In addition, in *Jenkins v. J.C. Penney Cas. Ins. Co.*, 167 W.Va. 597, 280 S.E.2d 252 (1981), we indicated that "proof of several breaches by an insurance company of W.Va.Code, 33–11–4(9), would be sufficient to establish . . . a general business practice[,]" and we further suggested that,

> Proof of other violations by the same insurance company to establish the frequency issue can be obtained from other claimants and attorneys who have dealt with such company and its claims agents, or from any person who is familiar with the company's general business practice in regard to claim settlement. Such information is, of course, subject to discovery, and it appears that the Legislature intended under W.Va.Code, 33–11–4(10), to require

insurance companies to maintain records on complaints filed against it.

167 W.Va. at 610, 280 S.E.2d at 260 (footnote omitted).[4]

Therefore, in view of our applicable law on the establishment of a general business practice under *W.Va.Code*, 33–11–4(9), we do not believe that the circuit court abused its discretion in limiting State Farm's cross-examination on the issue of statistical analysis. We also believe that State Farm's cross-examination of Mr. Diaz was sufficient to challenge Mr. Diaz's factual support for his assertion that State Farm had engaged in a general business practice of unfair settlement practices.[5]

State Farm next contends that the circuit court erred in permitting Mr. Diaz to offer testimony of other actions filed against State Farm. According to State Farm, the admission of this evidence invited the jury to punish State Farm based on the conduct described in the other cases in violation of the due process clause of the Fourteenth Amendment, and the value of this evidence was substantially outweighed by the danger of unfair prejudice, confusion of the issues and misleading the jury. State Farm also asserts that under *Jenkins* and its progeny, the only subsections of the Unfair Claim Settlement Practices Act under which Jackson should have been permitted to introduce evidence relating to a general business practice of handling claims of other insureds would

have been violations under subsections (d) and (f).

■ The record shows that Mr. Diaz testified to four cases in West Virginia involving State Farm in which, in his opinion, the same type of unfair conduct was involved. We do not believe that the circuit court abused its discretion in permitting this evidence to be admitted. As mentioned above, in *Jenkins* this Court indicated that a plaintiff may show a general business practice by presenting proof of other violations by the same insurance company obtained by other claimants and attorneys or through discovery from the defendant insurance company. This appears to be what Mr. Jackson did in this case in order to prove a general business practice.

■ We have held that "[r]ulings on the admissibility of evidence are largely within a circuit court's sound discretion and should not be disturbed unless there has been an abuse of discretion." Syllabus Point 2, *State v. Peyatt*, 173 W.Va. 317, 315 S.E.2d 574 (1983). In addition,

[a]lthough Rules 401 and 402 of the West Virginia Rules of Evidence strongly encourage the admission of as much evidence as possible, Rule 403 of the West Virginia Rules of Evidence restricts this liberal policy by requiring a balancing of interests to determine whether logically relevant is legally relevant evidence. Specifically, Rule 403 provides that although relevant, evidence may nevertheless be excluded when the danger of unfair preju-

---

4. We also have made clear that a plaintiff can prove a general business practice by showing several unfair settlement practices in the same claim. We held in Syllabus Point 4 of *Dodrill* that:

> To maintain a private action based upon alleged violations of *W.Va.Code*, 33–11–4(9) in the settlement of a single insurance claim, the evidence should establish that the conduct in question constitutes more than a single violation of *W.Va.Code*, 33–11–4(9), that the violations arise from separate, discrete acts or omissions in the claim settlement, and that they arise from a habit, custom, usage, or business policy of the insurer, so that, viewing the conduct as a whole, the finder of fact is able to conclude that the practice or practices are sufficiently pervasive or sufficiently sanctioned by the insurance company that the conduct can be considered a "general business

practice" and can be distinguished by fair minds from an isolated event.

5. State Farm also complains that the circuit court erred in prohibiting State Farm's expert, Don Kelley, from testifying as to whether State Farm violated the Unfair Claim Settlement Practices Act as a general business practice. The record shows that in a pre-trial ruling, the circuit court said that Mr. Kelley would not be permitted to testify that State Farm's agents and employees did not act with malice because State Farm could bring in such evidence through the testimony of its agents and employees. The circuit court indicated that it would revisit this issue after Mr. Diaz testified. However, State Farm did not proffer Mr. Kelley as a witness at trial. In light of our decision above that expert witnesses should not offer testimony on the absence or presence of malice, we do not find it necessary to address this alleged error.

dice, confusion, or undue delay is disproportionate to the value of the evidence. Syllabus Point 9, *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994). In the instant case, the circuit court carefully instructed the jury that evidence relating to other cases against State Farm was offered for the sole purpose of proving the general business practice of State Farm and should not be considered to determine whether State Farm committed unfair settlement practices against Mr. Jackson. Therefore, we do not believe that the circuit court abused its discretion in its admission of four other cases in West Virginia involving State Farm.[6]

Next, State Farm avers that the circuit court erred in admitting evidence of conduct by the insured's defense counsel in the underlying tort case in support of the argument that defense counsel was the agent of State Farm for the purpose of imputing bad faith conduct to State Farm. Mr. Jackson denies that litigation conduct was admitted at trial as evidence of State Farm's bad faith. Rather, says Mr. Jackson, all such evidence was for the sole purpose of allowing him to convey to the jury how State Farm's denial of his claims and the resulting litigation caused annoyance, inconvenience, distress, anguish, and worry.

■■■ Without having to decide whether or not the litigation conduct of an attorney was improperly admitted below, we note that recent decisions of this Court address this very issue and their principles should be applied in a retrial. In the recent case of *Rose v. St. Paul Fire and Marine Ins. Co.*, 215 W.Va. 250, 599 S.E.2d 673 (No. 31317, June 25, 2004), we held in Syllabus Point 5 that "[a] defense attorney who is employed by an insurance company to represent an insured in a liability matter is not engaged in the business of insurance. The defense attorney is therefore not directly subject to the provisions of the West Virginia Unfair Trade Practices Act, *W.Va.Code*, 33–11–1 to—10." Also, "[w]hen an insurance company hires a

defense attorney to represent an insured in a liability matter, the attorney's ethical obligations are owed to the insured and not to the insurance company that pays for the attorney's services." Syllabus Point 7, *Barefield v. DPIC Companies, Inc.*, 215 W.Va. 544, 600 S.E.2d 256 (No. 31226, June 25, 2004). Therefore, generally the lawyer for the insured is not subject to the Unfair Trades Practices Act, of which the Unfair Claim Settlement Practices Act is a part, and he or she is not an agent of the insurer so that his or her conduct may be imputed to the insurer. We made clear in Syllabus Point 10 of *Barefield*:

> An insurance company cannot be held liable under the West Virginia Unfair Trade Practices Act, *W.Va.Code*, 33–11–1 to 10, for the actions of a defense attorney retained to defend an insured, when the defense attorney's strategy and tactics are a result of the attorney's independent, professional discretion with regard to the representation of the client-insured, and are not otherwise relied upon or ratified by the insurance company in a manner contrary to the Act.

However, we also held that "[t]he conduct of an insurance company or other person in the business of insurance during the pendency of a lawsuit may support a cause of action under the West Virginia Unfair Trade Practices Act, *W.Va.Code*, 33–11–1 to –10." Syllabus Point 9, *Barefield*. Further, we stated in *Rose, supra*, in Syllabus Point 6, that:

> A claimant can establish a violation of the West Virginia Unfair Trade Practices Act, *W.Va.Code*, 33–11–1 to –10, by showing that an insurance company, through its own actions, breached its duties under the Act by knowingly encouraging, directing, participating in, relying upon, or ratifying wrongful litigation conduct of a defense attorney hired by the insurance company to represent an insured.

**6.** State Farm also alleges error in the admission of evidence of the Utah case of *Campbell v. State Farm*, 65 P.3d 1134 (2001), *reversed and remanded by* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), which was introduced by Mr. Jackson during trial as evidence of State Farm's

general business practice. However, the circuit court subsequently instructed the jury that the United States Supreme Court had agreed to review that case and because its judgment was not final, the jury should not consider that case on the issue of a general business practice.

We believe that this law adequately addresses any issue of litigation conduct which may arise in a retrial.

Finally, State Farm alleges several errors in connection with the award to Mr. Jackson of punitive damages. We decline to address these alleged errors. However, on remand, should the issue of punitive damages again arise the circuit court should assess any punitive damage award in light of this Court's holdings in *TXO Production Corp. v. Alliance Resources Corp.*, 187 W.Va. 457, 419 S.E.2d 870 (1992), *aff'd*, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366, (1993) and *Garnes v. Fleming Landfill*, 186 W.Va. 656, 413 S.E.2d 897 (1991), and the holdings of the United States Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) and *State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (which was decided since the unfair settlement practices trial below).[7]

## IV.

### Conclusion

For the foregoing reasons, we affirm the April 24, 2002 order of the Circuit Court of Brooke County to the extent that it denied State Farm's motion for summary judgment on the issues of State Farm's violation of *W.Va.Code*, 33–11–4(9)(d) and (f) and punitive damages. However, we reverse the circuit court's order to the extent that it granted summary judgment to David M. Jackson on the issues of State Farm's violation of *W.Va.Code*, 33–11–4(9)(d) and (f).

Likewise, we reverse the January 29, 2003 order of the Circuit Court of Brooke County that denied State Farm's motion for a new trial.

We remand this matter for proceedings not inconsistent with this opinion.

No. 31372—Affirmed, in part, reversed, in part, and remanded.

No. 31643—Reversed and remanded.

DAVIS, Justice concurring:

In this proceeding the majority opinion has granted State Farm a new trial, reversed the circuit court's summary judgment ruling on an issue in favor of Mr. Jackson, and affirmed the circuit court's denial of summary judgment to State Farm. I concur in the resolution of each of these issues. I have chosen to write separately to address two issues which I believe to be useful to the resolution of this case.

### A. Using Evidence of an Insurer's Out–of–State Conduct in a Bad Faith Action

In this proceeding Mr. Jackson introduced evidence of bad faith conduct by State Farm that was litigated in a case filed in the state of Utah. Although the trial court permitted the evidence, it instructed the jury that the Utah case was being reviewed by the United States Supreme Court. Here, State Farm assigned error to the admission of this evidence. The majority opinion glossed over the issue in a footnote without resolving the matter. I believe this is an important federal constitutional issue, because in *State Farm Mutual Insurance v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) the United States Supreme Court instructed all courts in the nation on how they are to treat such evidence, when it involves lawful out-of-state conduct by an insurer.[1]

---

**7.** Other issues raised by State Farm are that the circuit court erred in refusing to strike a prospective juror for cause in light of his comments of potential bias in favor of Mr. Jackson; the circuit court erred in denying State Farm's motion for a mistrial where State Farm was prohibited from conducting a meaningful *voir dire;* and the circuit court erred in refusing to grant a mistrial based on Mr. Jackson's counsel's use of the "golden rule" argument in his closing argument. Finally, State Farm urges application of the cumulative error doctrine. Because we reverse the trial verdict on other grounds and remand for a new trial, we find it unnecessary to address these issues. Finally, State Farm alleges

several errors in the circuit court's refusal to give numerous jury instructions proposed by State Farm. These alleged errors are raised absent supporting arguments and case law and will not be addressed by the Court.

**1.** The Supreme Court's decision binds us not only as a matter of federal supremacy under the United States Constitution, *see Cooper v. Aaron*, 358 U.S. 1, 18, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5, 19 (1958), but as a matter of State Constitutional law as well. W. Va. Const. Art. I, § 1 (..."The State of West Virginia is, and shall remain, one of the United States of America. The Constitu-

**1. Factual background of Campbell.** *Campbell* was a first-party bad faith action against an insurer that was filed in Utah. The plaintiff had previously been sued as a result of an automobile accident. The verdict exceeded his liability policy coverage. The insurer refused to pay the excess judgment. The plaintiff thereafter instituted a bad faith claim against his insurer. During the course of the *Campbell* trial, the plaintiff sought to prove that the insurer had a nationwide policy of engaging in bad faith conduct. To prove this contention, the plaintiff was allowed to introduce evidence of "all types" of lawful out-of-state conduct that was committed by the insurer. The jury eventually returned a verdict in favor of the plaintiff. The plaintiff was awarded $1 million in compensatory damages and $145 million in punitive damages. After the Utah supreme court affirmed the judgment, the United States Supreme Court granted certiorari. One of the issues addressed by the Supreme Court involved the use of an insurer's lawful out-of-state conduct.

**2. Guidelines for using evidence of an insurer's out-of-state conduct.** Justice Kennedy, writing for the majority in *Campbell*,[2] indicated that as a general rule, a plaintiff cannot introduce evidence of lawful or unlawful out-of-state conduct by a defendant, *for the sole purpose* of punishing the defendant. The court stated:

> A State cannot punish a defendant for conduct that may have been lawful where it occurred. Nor, as a general rule, does a State have a legitimate concern in imposing punitive damages to punish a defendant for unlawful acts committed outside of the State's jurisdiction.

*Campbell,* 538 U.S. at 421, 123 S.Ct. at 1522, 155 L.Ed.2d at 603 (citations omitted).

Later, however, in the *Campbell* opinion, the Court carved out an exception to the general rule regarding the introduction of evidence of "lawful" out-of-state conduct by a defendant.[3] The opinion held:

> Lawful out-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious, but that conduct must have a nexus to the specific harm suffered by the plaintiff. A jury must be instructed, furthermore, that it may not use evidence of out-of-state conduct to punish a defendant for action that was lawful in the jurisdiction where it occurred.
>
> . . .
>
> A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business. Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis.... Punishment on these bases creates the possibility of multiple punitive damages awards for the same conduct; for in the usual case nonparties are not bound by the judgment some other plaintiff obtains.

*Campbell,* 538 U.S. at 422–423, 123 S.Ct. at 1522–1523, 155 L.Ed.2d at 604 (citations omitted). In essence, Justice Kennedy concluded that there was no nexus between the lawful out-of-state conduct of the insurer and the conduct complained of by the plaintiff. *Campbell,* 538 U.S. at 424, 123 S.Ct. at 1524, 155 L.Ed.2d at 605.[4]

Before the Utah court, the plaintiffs were permitted to introduce evidence pertaining to State Farm's performance, planning and review or PP & R policy. The PP & R policy pertained to State Farm's business practices for over twenty years in numerous states. In fact, these practices bore no relation to a third-party automobile insurance claim, the

tion of the United States of America ... Shall be the supreme law of the land.")

**2.** Three justices dissented in the case.

**3.** Since the facts in *Campbell* involved only *lawful* out-of-state conduct, the opinion did not expressly state that its exception applied to *unlawful* out-of-state conduct.

**4.** Although the opinion was not explicit, it appears that the Court did not find reversible error in the admission of the improper evidence because other admissible evidence was sufficient to warrant punishment.

type of claim underlying the Campbell's complaint against the company. In determining, that the evidence was inadmissible, the Campbell court held:

> The Campbells have identified scant evidence of repeated misconduct of the sort that injured them. Nor does our review of the Utah court's decisions convince us that State Farm was only punished for its actions toward the Campbells. Although evidence of other acts need not be identical to have relevance in the calculation of punitive damages, the Utah court erred here because evidence pertaining to claims that had nothing to do with a third-party lawsuit was introduced at length. Other evidence concerning reprehensibility was even more tangential. For example, the Utah Supreme Court criticized State Farm's investigation into the personal life of one of its employees and, in a broader approach, the manner in which State Farm's policies corrected its employees.

538 U.S. 408 at 423–424, 123 S.Ct. at 1523, 155 L.Ed.2d at 605.

In concluding the Court held:

> In this case, because the Campbells have shown no conduct by State Farm similar to that which harmed them, the conduct that harmed them is the only conduct relevant to the reprehensibility analysis.

538 U.S. 408 at 424, 123 S.Ct. at 1524, 155 L.Ed.2d at 605.

In summary, the ruling in *Campbell* on the use of a defendant's lawful out-of-state is binding on the courts of West Virginia. *Campbell* based its ruling on the requirements of the Due Process Clause of the Fourteenth Amendment.[5] Insofar as *Campbell's* ruling is constitutionally based, I believe the majority opinion should have addressed this matter.

### B. The Standard for Assessing Whether Punitive Damages Are Excessive

In the instant case, State Farm also assigned error on the issue of the amount of punitive damages awarded by the jury. The majority opinion declined to address the issue because a new trial was being granted. I believe the majority opinion should have

addressed the issue in light of principles set out by the Supreme Court in *Campbell.*

As I previously indicated, in *Campbell* the jury awarded the plaintiff one-million dollars in compensatory damages and one hundred forty five million dollars in punitive damages. In its appeal to the United States Supreme Court, the insurer argued that the amount of punitive damages violated due process. The Supreme Court agreed with the insurer. In doing so, the opinion indicated the following:

> We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.... While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with [greater] ratios....

*Campbell* 538 U.S. at 425, 123 S.Ct. at 1524, 155 L.Ed.2d at 605–606 (citations and internal quotation marks omitted).

*Campbell* reversed the punitive damages award and remanded the case to the Utah supreme court for reconsideration of the award. On remand, the Utah supreme court reduced the punitive damages award and held that the "insurer's conduct warranted punitive damages of $9,018,780.75, nine times the compensatory and special damages for emotional distress[.]" *Campbell v. State Farm Mut. Auto. Ins. Co.,* 2004 WL 869188 (Utah Apr. 23, 2004). *See Bardis v. Oates,* 119 Cal.App.4th 1, 14 Cal. Rptr.3d 89, (2004), 119 Cal.App.4th 1, 14 Cal.Rptr.3d 89, 92 (2004) ("[I]n light of recent due process constraints laid down by the United States Supreme Court in *State Farm Mutual Insurance v. Campbell,* we shall modify the punitive damages award from $7 million to $1.5 million, and affirm the judgment as modified."). *But see Reatta Resources, Inc. v. Kraft,* 2004 WL 423144,

---

5. *See supra* fn. 1.

at *2 (Tex.App.-Dallas Mar.9, 2004) ("Reatta has not shown error apparent on the face of the record merely by pointing to a 33 to 1 ratio of punitive damages to compensatory damages. Therefore, we are unable to conclude from the ratio alone that the punitive damage award is excessive.").

In view of the foregoing, I concur.

MAYNARD, Chief Justice, concurring, in part, and dissenting, in part:

I concur in the ultimate disposition of these combined cases. I also concur with the new law articulated in the majority opinion in Syllabus Points 3, 4, and 5. However, I dissent to the law on when liability is "reasonably clear" as set forth in Syllabus Point 2, and I strongly dissent to the majority opinion's treatment of the punitive damages issue.

First, I do not agree with the majority opinion's definition of "reasonably clear." As noted by the majority opinion, the usual definition of clear is "evident" or "plain." In addition, other courts have construed the words "reasonably clear" to demand a significant degree of certainty. As quoted, but subsequently ignored, by the majority opinion, *American Universal Ins. Co. v. Medical Malpractice Joint Underwriting Ass'n of Mass.,* 1993 WL 818614 *22 (Mass.Super.), provides:

> "Reasonably *clear*" seems also to call for a higher level of certainty than "reasonably *likely*" would. The legislative choice of the word "clear" seems to suggest that the matter has reached a point where reasonable minds could not honestly differ. Liability need not be absolutely certain, or beyond reasonable doubt, but it must be "clear" enough that reasonable people would agree about it. Put conversely, if there is room for objectively reasonable debate about whether liability exists, then it is not "reasonably clear."

During this Court's consideration of the instant cases, I proposed a new syllabus point on the definition of "reasonably clear" as follows:

> "Reasonably clear" as stated in W.Va. Code § 33–11–4(9)(f) (2002), means that liability is so plain that reasonable people, with knowledge of the relevant facts and law, could not honestly differ on the conclusion that the defendant-insured is liable to the plaintiff.

I believe that this definition accords with the usual meaning of "clear." In contrast, there is little or no difference between the majority opinion's definition of "reasonably clear" and the common definition of "preponderance of the evidence" which the circuit court used in improperly granting partial summary judgment to Mr. Jackson. In light of the majority opinion's definition, it is likely that the circuit court judge below will wonder why his summary judgment order is reversed.

In addition, I strongly disagree with the majority opinion's cursory treatment. of the punitive damages issue. Although we reverse and remand on other grounds, the propriety of the punitive damages award below was briefed and argued before this Court. In addition, the briefs of both parties cite the United States Supreme Court case of *State Farm Mutual Automobile Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), which was decided since the trial below. *Campbell* is highly relevant to both the type of evidence which may be admitted to prove the appropriateness of punitive damages as well as whether a punitive damages award is excessive, both of which are issues in this case. Nevertheless, the majority opinion merely refers this landmark case to the circuit court without further comment and without giving him a clear roadmap.

In *Campbell,* the insureds brought an action against their insurer, State Farm, to recover for bad-faith failure to settle within the policy limits and damages for fraud and intentional infliction of emotional distress. A jury awarded the insureds $2.6 million in compensatory damages and $145 million in punitive damages, which the trial court reduced to $1 million and $25 million respectively. On appeal, the Utah Supreme Court reinstated the $145 million punitive damages award. The United States Supreme Court subsequently reversed the punitive damages award because it found it to be "neither reasonable nor proportionate to the wrong

committed," and "an irrational and arbitrary deprivation of the property of the defendant" in violation of the Fourteenth Amendment. *State Farm v. Campbell,* 538 U.S. at 429, 123 S.Ct. at 1526. In reaching this conclusion, the Supreme Court discussed the type of evidence that may be admitted in proving the appropriateness of punitive damages.

The insureds in *Campbell* sought to show the reprehensible conduct of State Farm by introducing evidence of State Farm's business practices for over 20 years in numerous states. The Court found this evidence to be improper. First, the Court said that "[a] State cannot punish a defendant for conduct that may have been lawful where it occurred." 538 U.S. at 421, 123 S.Ct. at 1522 (citations omitted). The Court explained, however, that

> Lawful out-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious, but that conduct must have a nexus to the specific harm suffered by the plaintiff. A jury must be instructed, furthermore, that it may not use evidence of out-of-state conduct to punish a defendant for action that was lawful in the jurisdiction where it occurred.

538 U.S. at 422, 123 S.Ct. at 1522–23 (citation omitted). Second, the Court expounded that, as a general rule, a State has no legitimate concern "in imposing punitive damages to punish a defendant for unlawful acts committed outside of the State's jurisdiction. Any proper adjudication of conduct that occurred outside Utah to other persons would require their inclusion, and, to those parties, the Utah courts, in the usual case, would need to

apply the laws of their relevant jurisdiction." 538 U.S. at 421–22, 123 S.Ct. at 1522 (citation omitted).

The Court's conclusion that improper evidence was admitted in *Campbell* specifically was based on its finding that,

> The courts awarded punitive damages to punish and deter conduct that bore no relation to the [insureds'] harm. A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages. A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business.

538 U.S. at 422–23, 123 S.Ct. at 1523. The Court further explained:

> The [insureds] have identified scant evidence of repeated misconduct of the sort that injured them. Nor does our review of the Utah courts' decisions convince us that State Farm was only punished for its actions toward the [insureds]. Although evidence of other acts need not be identical to have relevance in the calculation of punitive damages, the Utah court erred here because evidence pertaining to claims that had nothing to do with a third-party lawsuit [1] was introduced at length. Other evidence concerning reprehensibility was even more tangential. For example, the Utah Supreme Court criticized State Farm's investigation into the personal life of one of its employees and, in a broader approach, the manner in which State Farm's policies corrupted its employees. The [insureds'] attempt to justify the court's reliance upon this unrelated testi-

---

1. The insureds' action against their insurer, State Farm, was what we call an excess verdict bad faith claim. The facts were that the driver insured by State Farm attempted to pass six vans traveling on a two-lane highway when his vehicle was involved in a three-vehicle accident in which the driver of one of the other vehicles was killed and the driver of the remaining vehicle was permanently disabled. In the ensuing wrongful death and tort action, the insured driver insisted that he was not at fault. State Farm contested liability and declined offers to settle for the policy limit of $50,000 ($25,000 per claimant). A jury determined that the insured driver was 100 percent at fault, and a judgment was returned for

$185,849. At first, State Farm refused to cover the $135,849 in excess liability. Its counsel remarked to the insureds, "You may want to put for sale signs on your property to get things moving." Moreover, State Farm refused to post a supersedeas bond to allow the insured driver to appeal the judgment against him. As a result, the insured driver obtained his own counsel to appeal the verdict. While the appeal was pending, the insured driver reached an agreement with the plaintiffs whereby the plaintiffs agreed not to seek satisfaction of their claims against the insureds. In exchange, the insureds agreed to pursue a bad faith action against State Farm and to be represented by the plaintiffs' attorneys.

mony on the theory that each dollar of profit made by underpaying a third-party claimant is the same as a dollar made by underpaying a first-party one. For the reasons already stated, this argument is unconvincing. The reprehensibility guidepost does not permit courts to expand the scope of the case so that a defendant may be punished for any malfeasance, which in this case extended for a 20–year period. In this case, because the [insureds] have shown no conduct by State Farm similar to that which harmed them, the conduct that harmed them is the only conduct relevant to the reprehensibility analysis.

538 U.S. at 423–24, 123 S.Ct. at 1523–24 (citation omitted) (footnote added).

The Court in *Campbell* further discussed constitutional limits on the ratio between the amount of the compensatory damages award and the punitive damages award. While the Court declined to impose a bright-line ratio which a punitive damages award cannot exceed, it opined that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." 538 U.S. at 425, 123 S.Ct. at 1524. The Court explained that "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of ... 145 to 1." *Id.* However,

> ratios greater than those we have previously upheld may comport with due process where "a particularly egregious act has resulted in only a small amount of economic damages." [*BMW of North America, Inc. v. Gore,* 517 U.S. 559, 582, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)].... The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.

538 U.S. at 425, 123 S.Ct. at 1524. The Court concluded that "courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general dam-

ages recovered." 538 U.S. at 426, 123 S.Ct. at 1524.

Based on the Supreme Court's analysis in *Campbell,* I proposed three new syllabus points, all of which are taken verbatim from *Campbell.* These proposed syllabus points, which were rejected by the majority, are as follows:

• In a claim for unfair settlement practices under W.Va.Code § 33–11–4(9) (2002), a State cannot punish a defendant for conduct that may have been unlawful where it occurred. Nor, as a general rule, does a State have a legitimate concern in imposing punitive damages to punish a defendant for unlawful acts committed outside of the State's jurisdiction.

• In a claim for unfair settlement practices under W.Va.Code § 33–11–4(9) (2002), lawful out-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious, but that conduct must have a nexus to the specific harm suffered by the plaintiff. A jury must be instructed, furthermore, that it may not use evidence of out-of-state conduct to punish a defendant for action that was lawful in the jurisdiction where it occurred.

• In assessing the constitutionality of a punitive damages. award under the due process clause, single-digit multipliers are more likely to comport with due process, while still achieving the State's goal of deterrence and retribution, than awards with greater ratios. However, greater ratios may comport with due process where a particularly egregious act results in only a small amount of damages. The converse is also true. When compensatory damages are substantial, a lesser ratio, perhaps equal only to compensatory damages, may reach the outermost limit of the due process guarantee.

On remand, if called upon to assess the appropriateness of a punitive damages award, the trial court is bound to follow the rules above which are taken straight from *Campbell.* Significantly, *Campbell* is based on the Due Process Clause of the Federal Constitution and applies to all of the states.

Unfortunately, although I do not know for certain, I fear that the majority of this Court rejected these proposed syllabus points because it does not like *Campbell*. I fervently hope that the next time a punitive damages award is reviewed by this Court, the majority will abide by the United States Supreme Court's decision in *Campbell*, even if it does not like or agree with *Campbell's* holdings. The rule of law demands that ordinary citizens follow laws with which they do not agree. Likewise, we as judges are bound by controlling legal precedent. *Campbell* is the law of the land, and it must be applied everywhere in the United States, including in West Virginia.

For the reasons set forth above, I concur, in part, and dissent, in part.

Chief Justice MAYNARD concurs, in part, and dissents, in part, and reserves the right to file a separate opinion.

Justice DAVIS concurs and reserves the right to file a separate opinion.

Justice McGRAW concurs and reserves the right to file a separate opinion.

McGRAW, Justice, concurring:

I write separately to note that I would have voted to affirm the lower court, but lacking sufficient company to embark upon that course, I find it necessary to concur with the decision of the majority. Morever, I write because the parties and the majority have made mention of the U.S. Supreme Court's opinion in *State Farm v. Campbell*,[1] as a case that the lower court should consider upon remand. The defendant in that case, State Farm, like the defendant in the instant case, State Farm,[2] was accused of what we call "bad faith." In order to view that decision in its proper context, it may be informative for all to be aware of the underlying conduct in that case.

The U.S. Supreme Court has stated that "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's

conduct." *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589, 1599, 134 L.Ed.2d 809, 826 (1996). With that thought in mind, a review of State Farm's breathtaking reprehensibility in the *Campbell* case is worthy of note. In the words, of the six justice majority opinion, that in the end granted a huge victory to State Farm:

> [W]e must acknowledge that State Farm's handling of the claims against the Campbells merits no praise. The trial court found that State Farm's employees altered the company's records to make Campbell appear less culpable. State Farm disregarded the overwhelming likelihood of liability and the near-certain probability that, by taking the case to trial, a judgment in excess of the policy limits would be awarded. State Farm amplified the harm by at first assuring the Campbells their assets would be safe from any verdict and by later telling them, postjudgment, to put a for-sale sign on their house.

*State Farm v. Campbell*, 538 U.S. 408, 419, 123 S.Ct. 1513, 1521, 155 L.Ed.2d 585, 602 (2003). And this is the description given to us by the majority of the Court that was *favorable* to State Farm.

Justice Ginsburg, who dissented along with Justices Scalia and Thomas, filled in the details of the plaintiffs' case, which was based upon State Farm's alleged nationwide scheme called the "Performance, Planning & Review" program. As Justice Ginsburg explains, the Campbells proved to the satisfaction of the Utah Court that State Farm had:

> demonstrated that the PP & R program regularly and adversely affected Utah residents. Ray Summers, the adjuster who handled the Campbell case and who was a State Farm employee in Utah for almost twenty years, described several methods used by State Farm to deny claimants fair benefits, for example, falsifying or withholding of evidence in claim files. A common tactic, Summers recounted, was "to unjustly attac[k] the character, reputation and credibility of a claimant and mak[e]

---

1. 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).

2. No assertion is made in this separate opinion that the two defendants are necessarily the same entity.

notations to that effect in the claim file to create prejudice in the event the claim ever came before a jury." State Farm manager Bob Noxon, Summers testified, resorted to a tactic of this order in the Campbell case when he "instruct[ed] Summers to write in the file that Todd Ospital (who was killed in the accident) was speeding because he was on his way to see a pregnant girlfriend." In truth, "[t]here was no pregnant girlfriend."

*Campbell,* 538 U.S. at 432, 123 S.Ct. at 1528, 155 L.Ed.2d at 610 (2003) (Ginsburg, J., dissenting) (some internal quotations and citations omitted). As if besmirching the reputation of a dead man before the jury were not enough, the plan also involved destroying key documents, padding files, and "has functioned, and continues to function, as an unlawful scheme ... to deny benefits owed consumers by paying out less than fair value in order to meet preset, arbitrary payout targets designed to enhance corporate profits." *Id.* (internal quotations and citations omitted). Finally, and most damning, Justice Ginsburg remarked:

> The trial court further determined that the jury could find State Farm's policy "deliberately crafted" to prey on consumers who would be unlikely to defend themselves. In this regard, the trial court noted the testimony of several former State Farm employees affirming that they were trained to target "the weakest of the herd"—the elderly, the poor, and other consumers who are least knowledgeable about their rights and thus most vulnerable to trickery or deceit, or who have little money and hence have no real alternative but to accept an inadequate offer to settle a claim at much less than fair value.

*Campbell,* 538 U.S. at 433, 123 S.Ct. at 1528–29, 155 L.Ed.2d at 610 (2003) (Ginsburg, J., dissenting) (internal citations and quotations omitted). Furthermore, the Campbells introduced evidence that local State Farm managers were under instructions to not report any judgment against them less than *100 million dollars,* and that only an award

of this magnitude could discourage State Farm from its unlawful activity.

It is in the context of this heinous conduct that one should pass judgment on the size of the punitive award. Unfortunately, the majority of the nine justices did not focus on "the degree of reprehensibility of the defendant's conduct," *Gore, supra,* but instead chose to substitute the jury's judgment with their own. *Campbell,* 538 U.S. at 431, 123 S.Ct. at 1527, 155 L.Ed.2d at 610 (2003) (Ginsburg, J., dissenting). Nonetheless, it is worth noting these facts because the truth is too often lost in the excitement that surrounds a large award. The media is quick to report a multi-million dollar award, but often slow to report the conduct giving rise to that award, if at all. Opinion pages are quick to parrot the defense lawyer's comment that the verdict is "outrageous" or "excessive," but usually silent when it comes to explaining the facts behind the headline.[3]

It is not ours to judge whether the high Court did the right thing in reducing the 145 million dollar award in *Campbell,* but it is vital that we not be blinded by the sheer size of an award when considering its validity. As noted in my dissent in *Kocher v. Oxford Life Insurance Company,* —— W.Va. ——, 602 S.E.2d 499 (No. 31539, June 17, 2004), courts should not shy away from a large punishment, if the defendant received all the procedural protections our law requires, just because the number is hard for us to conceptualize. Sometimes very wealthy defendants must be subject to very large damage awards, if that is what it will take to deter future antisocial conduct. Simple ratios are unlikely to produce justice in complex, real world cases.

I echo the majority's recommendation that the retrial in this case be conducted in accord with our longstanding damages jurisprudence found in *Garnes v. Fleming Landfill, Inc.,* 186 W.Va. 656, 413 S.E.2d 897 (1991), *TXO Production Corp. v. Alliance Resources Corp.,* 187 W.Va. 457, 419 S.E.2d 870 (1992),

**3.** *See,* Ned Miltenberg, Erwin Chemerinsky, *Punitive Damages After Campbell, Smith, and Romo,* 39 Aug Trial 18 (2003).

**656**

*aff'd*, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), and their progeny.[4]

4. The United States Supreme Court's decisions in *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), and *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 19, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) are also relevant to the extent they have not been expressly overruled by *Campbell*.