617 S.E.2d 457

Garrett M. HICKS, a minor, By and Through Donna J. SAUS, his mother, guardian and next friend, and Donna J. Saus, individually, and on behalf of all others similarly situated, Plaintiffs Below, Appellees,

v.

Todd A. JONES; Criswell Electric Motor Service, Inc., a division of Mull Machine Company, a West Virginia corporation; Mull Machine Company, a West Virginia corporation; and Liberty Mutual Fire Insurance Company, a foreign corporation, Defendants Below, Appellants.

No. 31754.

Supreme Court of Appeals of West Virginia.

Submitted: March 8, 2005.

Filed: July 8, 2005.

Robert P. Fitzsimmons, Esq., Russell J. Guthrie, Esq., Fitzsimmons Law Offices, Michael W. McGuane, Esq., Wheeling, Carl S. Kravitz, Esq., Frost Brown Todd, LLC, Washington, DC, for Appellees.

Clarence E. Martin, III, Esq., Susan Snowden, Esq., Allison A. Marquina, Esq., Martin & Seibert, LC, Martinsburg, for Amicus Curiae West Virginia Chamber of Commerce.

Ancil G. Ramey, Esq., Hannah G. Curry, Esq., Steptoe & Johnson, Charleston, James F. Companion, Esq., Schrader, Byrd & Companion, PLLC, Wheeling, Charles S. Cassis, Esq., Donald L. Miller, Esq., Zuckerman, Spaeder, LLP, Louisville, KY, for Liberty Mutual Fire Insurance Company.

Justice STARCHER delivered the Opinion of the Court.

STARCHER, J.

In this appeal from the Circuit Court of Ohio County, we are asked to review a circuit court order finding that when an insurance company settles a plaintiff's loss of earnings claim for net, after-tax wages rather than gross wages, as a matter of law the insurance company has failed to make a "fair and equitable" settlement offer in violation of the West Virginia Unfair Trade Practices Act. In so finding, the circuit court ruled as a matter of law that the appellant insurance company in this case had violated the Act.

As set forth below, we find that the circuit court correctly determined that a plaintiff's claim of damages for loss of earnings or impairment of future earning capacity should be resolved upon the plaintiff's gross earnings or earning capacity, and should not be reduced because of any income tax or other paycheck-type deduction. The circuit court's order in this respect is affirmed. However, whether an insurance company's settlement

offer is "fair and equitable" under the Act is often dependent upon a number of variables and is ordinarily a question of fact for the jury. Accordingly, we hold that the circuit court erred in ruling as a matter of law that the appellant insurance company had violated the Act. We therefore reverse the circuit court's order on this latter point.

## I.

### Facts & Background

On June 27, 1997, plaintiff-below and appellee Garrett Hicks was seriously injured when his vehicle was rear-ended by a vehicle insured by defendant-below and appellant Liberty Mutual Fire Insurance Company ("Liberty Mutual"). An adjuster working for Liberty Mutual, Bogdan Misovic, investigated the case and conceded that Liberty Mutual's insured was at fault for the collision.

At the time of the accident, Mr. Hicks was a minor and was employed part time. Mr. Hicks' mother, plaintiff-below and appellee Donna J. Saus, informed Liberty Mutual that Mr. Hicks would miss fifty-three days of work as a result of his injuries.[1] Ms. Saus provided Liberty Mutual with verification of her son's lost wages, and requested $1,510.50 in compensation.

Mr. Misovic advised Ms. Saus that Liberty Mutual would pay the loss of earnings claim, but that twenty percent would be withheld from the lost earnings payment for taxes. On August 25, 1997, Ms. Saus received a check from Liberty Mutual for $1,208.40. Ms. Saus contacted Mr. Misovic and argued that her son did not pay taxes, and would never have paid the $302.10 in taxes that Liberty Mutual had deducted from the check. When Mr. Misovic responded that the deduction was nonetheless "Liberty's policy," Ms. Saus requested that Mr. Misovic provide her with either a 1099 form or a letter confirming that Liberty Mutual withheld the amount for

taxes. In a letter dated September 8th, Liberty Mutual stated that from the total of gross wages, "$302.10 was deducted for taxes of 20 percent resulting in a net total of $1,208.40 for which Garrett Hicks was reimbursed."

Ms. Saus continued to dispute Liberty Mutual's "tax deduction" from the wage settlement, and on October 20th provided Mr. Misovic with documentation that Mr. Hicks was tax exempt. In response, Liberty Mutual issued a check on November 14th that included the twenty percent, or $302.10, that was previously deducted.

The appellees, Mr. Hicks and Ms. Saus[2], subsequently brought the instant lawsuit against Liberty Mutual. The appellees alleged, *inter alia*, that Liberty Mutual had wrongfully attempted to withhold a portion of Mr. Hicks' lost wages settlement for the purpose of making a profit and preventing Mr. Hicks from receiving his legally-entitled damages caused by the negligence of Liberty Mutual's insured. Mr. Hicks contended that Liberty Mutual's actions constituted fraud; a violation of the West Virginia Unfair Trade Practices Act, *W.Va.Code*, 33–11–1 to –10; and the tort of outrageous conduct. Mr. Hicks also alleged that Liberty Mutual's actions were the result of a general policy that also adversely affected other West Virginia citizens, and therefore included a request for class action status.[3]

After extensive discovery the parties filed cross motions for summary judgment. In an order dated December 10, 2003, ostensibly denying both motions, the circuit court made several legal conclusions that were binding upon and detrimental to the appellant and which, *ipso facto*, granted partial summary judgment to the appellees. The circuit court concluded, as a matter of law, that a West Virginia personal injury claimant is entitled to receive, as part of their damages, their lost gross wages without any reduction for

---

1. At the time Liberty Mutual made its first payment on the appellees' lost wage claim, Mr. Hicks had missed forty-three days of work, and on a doctor's order was planning on missing another ten days of work.

2. Ms. Saus brought the lawsuit both individually and as the mother, guardian and next friend of

then-minor Mr. Hicks. Mr. Hicks has long since attained the age of majority and proceeds on his own behalf.

3. According to the parties, the circuit court has not yet ruled upon the class certification issue.

taxes or other items deductible from the claimant's paycheck. The circuit court further concluded, as a matter of law, that the Unfair Trade Practices Act (specifically, *W.Va.Code,* 33–11–4(9)(f) [4]) requires an insurer, when liability is reasonably clear, to offer a "fair and equitable" settlement amount reflecting the reasonable value of the specific item claimed under the applicable law.

Applying these two legal conclusions, the circuit court found that an insurance company's offering or settling for "net," after-tax wages is a prohibited practice under the Unfair Trade Practices Act, because the reasonable value of a claim under West Virginia law is gross wages. The circuit court then concluded that:

> Liberty violated existing West Virginia law in paying Garrett Hicks net wages by "not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear," as required by W.Va.Code § 33–11–4(9)(f).

> Liberty Mutual now appeals the circuit court's December 10, 2003 order.

## II.

### Standard of Review

■■■ Appellant Liberty Mutual appeals the circuit court's order denying its motion for summary judgment, but also—in essence—granting partial summary judgment to the appellees. As this Court stated in Syllabus Point 1 of *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994), "A circuit court's entry of summary judgment is reviewed *de novo.*" Similarly, when review of a circuit court's denial of summary judgment

4. *W.Va.Code,* 33–11–3 [1974] prohibits any person from engaging in "an unfair method of competition or an unfair or deceptive act or practice in the business of insurance." The particular unfair practice relied upon by the appellees is defined in *W.Va.Code,* 33–11–4(9)(f) [2002], which states in pertinent part:

> The following are defined as unfair methods of competition and unfair or deceptive acts or practices in the business of insurance: ...
> (9) Unfair claim settlement practices.—No person shall commit or perform with such frequency as to indicate a general business practice any of the following: ...

is properly before this Court, we examine anew the circuit court's ruling. "This Court reviews *de novo* the denial of a motion for summary judgment, where such a ruling is properly reviewable by this Court." Syllabus Point 1, *Findley v. State Farm Mut. Auto. Ins. Co.,* 213 W.Va. 80, 576 S.E.2d 807 (2002).[5] "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." *Aetna Casualty & Surety Co. v. Federal Ins. Co. of New York,* 148 W.Va. 160, 133 S.E.2d 770 (1963).

## III.

### Discussion

The legal issue before the Court is fairly narrow: does an insurance company, *as a matter of law,* violate the Unfair Trade Practices Act when it offers to settle a claim for an amount less than that allowed by West Virginia law? Is there no room, as the circuit court found, for a question of fact to exist? In other words, after liability has become "reasonably clear," is an insurance company never attempting in good faith to "effectuate a prompt, fair and equitable settlement" of a plaintiff's damages for accrued loss of earnings when it reduces the payment to the plaintiff by an arbitrary or a calculated amount such as one which might have been deducted from the plaintiff's paycheck (such as income taxes, Social Security and Medicare payments, vacation funds, health and life insurance premiums, Christmas club deductions, union dues, and so on)?

> (f) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear[.]

5. Although neither party raises this issue, we find the circuit court's denial of Liberty Mutual's motion for summary judgment to be properly reviewable on appeal to this Court. *See generally Findley v. State Farm Mut. Auto. Ins. Co.,* 213 W.Va. 80, 100; 576 S.E.2d 807, 827 (2002) ("[W]here ... the order denying one party's motion for summary judgment simultaneously grants summary judgment to another party, such an order is final and appealable.").

To resolve this issue, we must first address a collateral question: does West Virginia law allow a plaintiff to recover "net" earnings and earning capacity, or "gross" earnings and earning capacity, lost as a result of a personal injury?

The parties, in their briefs and in their oral arguments to the Court, have wrapped these narrow questions in colorful hyperbole that is demonstrative of the finest in appellate advocacy, but which distracts attention from the questions at the core of the case.

For instance, appellant Liberty Mutual asserts that this case, costing hundreds of thousands of dollars in legal fees and consuming over five years of time, is really all about nothing more than $302.10 in cash—money that "was paid to Mr. Hicks in less than a month after his mother provided documentation of his tax-exempt status." [6] In sum, Liberty Mutual asserts that Mr. Hicks has no provable damages.

The appellees, meanwhile, assert that damages consisting of "multimillions of dollars over the years . . . have been taken from West Virginia citizens," [7] including the appellees, as a result of Liberty Mutual's policy of paying claimants less than their full damages. Citing to numerous documents and depositions, the appellees suggest that Liberty Mutual had a policy of paying "net" rather than "gross" wages, and knew that its policy violated the Unfair Trade Practices Act. For example, the appellees note that as early as 1999, Liberty Mutual informed the circuit court that it had no policy of deducting taxes for lost wage claims in West Virginia—but in 2003 a discovery deposition of a Liberty Mutual training supervisor revealed that adjusters were trained, in accordance with policy, to make tax and other deductions to lost earnings claims. [8] In another deposition, a Liberty Mutual claims manager testified he had no idea what the law of West Virginia was regarding a plaintiff's right to net or gross wages; discovery later revealed a memo written by the same claims manager eleven months before his deposition where he wrote to claims adjusters saying, "reducing a gross wage claim by 20% for net income . . . is not permitted in the State of West Virginia. If you do this you could be found in bad faith."

The appellees suggest that Liberty Mutual reduced most lost wage settlement claims by at least twenty percent, if not more. For instance, one Liberty Mutual adjuster testified that he automatically withheld twenty percent from between seventy to eighty percent of all lost wage claims he reviewed under the pretext of "tax withholdings." An expert for the appellees estimated that Liberty Mutual withheld, on average, $670.69 from ninety-two percent of all lost wage claims. Because Liberty Mutual's conduct potentially affected many West Virginians, the appellees assert that their case is entitled to class action status.

6. *Brief of the Appellant* at 4 fn. 4. We note, however, that the appellant's *Brief* indicates that Liberty Mutual received and agreed to pay Mr. Hicks' wage loss claim on July 9, 1997; that on July 29, 1997, Liberty Mutual requested "pay verification to process lost wage claim;" and that it had verification of Mr. Hicks' lost wages by August 8, 1997. It was at this point that Ms. Saus challenged Liberty Mutual's 20% deduction from the wage loss claim "to take into account income tax consequences." The appellant's *Brief* states that Liberty Mutual paid Mr. Hicks the final 20% of his wage loss claim on November 14, 1997.

7. *Brief on Behalf of Appellee* at 9.

8. In a June 10, 2003 deposition, the following exchange occurred between appellees' counsel and a Liberty Mutual employee who trains claims adjusters:

Q: Have you taught that the policy, in your teaching of adjusters, that the policy at Liberty is to pay net pay as opposed to gross pay on wages?
A: . . . [I]n the big picture of claims handling, yes.
Q: Okay. So for the majority of states you tell them to pay net wages as opposed to gross wages?
A: That's right.
Q: And that's in clear liability cases?
A: Yes. . . .
Q: How long have you been teaching that as a policy of Liberty in the majority of states?
A: I have been in the training department since March of 1996 . . . .
Q: [I]n a majority of states have you taught, as a policy of Liberty since March of '96, to pay net wages as opposed to gross wages when liability was reasonably clear in personal injury claims?
A: Yes.

We will attempt to assess the fundamental legal questions at the core of this case without being swayed by the impassioned, hotly-contested arguments of the parties swirling at the periphery.

The first fundamental legal question in this case concerns whether a plaintiff, who is making a claim for past or future wages lost as a result of a personal injury, is entitled to recover as damages gross wages, or recover net wages that reflect the plaintiff's paycheck deductions (such as income taxes).

The appellees assert a plaintiff is entitled to recover gross, pre-tax, pre-deduction wages, and that the question has been settled in two prior West Virginia cases: *Crum v. Ward*, 146 W.Va. 421, 122 S.E.2d 18 (1961), and *Flannery v. U.S.*, 171 W.Va. 27, 297 S.E.2d 433 (1982). These two cases are indirectly an offshoot of Congress' adoption, in 1954, of Internal Revenue Code section 104(a)(2), which states that "the amount of any damages ... received ... on account of personal physical injuries or physical sickness" is excluded from gross income. *See* 26 U.S.C. § 104(a)(2) [2002]. Since that date, numerous state and federal courts—including this Court—have attempted to give effect to this income tax exemption, without confusing juries attempting to calculate the damages for which the defendant is liable.

■ We begin by noting the parties' interpretations of these two cases. To begin, the appellees rely upon Syllabus Point 12 of *Crum v. Ward, supra,* where we stated:

> In an action for damages for personal injuries, it is not reversible error for the court to refuse to read to the jury an instruction to the effect that, in the event of a recovery by plaintiff, no sum should be allowed in respect to any Federal income tax.

The appellees assert that *Crum* makes clear that a personal injury lost wage claim should be calculated without regard to the effect of income taxes, and that a plaintiff settling with an insurance company is therefore entitled to pre-tax gross wages. The appellant, however, asserts that *Crum* applies only to jury instructions. The appellant argues that *Crum* does not require an insurance compa-

ny, when settling a lost wage claim, to pay only gross wages; rather, the appellant argues that *Crum* merely stands for the proposition that, under certain circumstances, it is not reversible error for a judge to refuse to instruct a jury regarding the effect of the federal tax code on a plaintiff's recovery.

■ In the other case relied upon by the appellees, *Flannery v. U.S., supra,* the Court stated at Syllabus Point 4 that "[i]n computing the loss of future earning capacity a deduction need not be made for federal income taxes." The appellees interpret *Flannery* to mean that no deductions may be made when resolving either a plaintiff's lost wage claim or resolving a plaintiff's loss of future earning capacity claim. The appellant, however, argues that *Flannery* provides no guidance to insurance companies attempting to settle a lost wage claim like that in the instant case because (a) *Flannery* applies to jury awards, not settlements, and (b) *Flannery* discusses loss of future earning capacity, not past lost wages.

After carefully reading the holdings of *Crum* and *Flannery* and the Court's reasoning underlying those holdings, we find the appellee's interpretation of these two cases to be correct, and the appellant's interpretation to be specious, at best.

First, the appellant correctly notes that the Court in *Crum* was asked to determine whether the trial court erred in refusing to give the defendants' proposed jury instructions concerning the effect of federal income taxes, or lack thereof, on any award that the jury might give to the plaintiff. But in reaching the conclusion that the trial court committed no error in refusing the instructions, this Court first determined that it would follow the reasoning of a majority of courts which had held that, in calculating a plaintiff's damages for loss of past earnings or for impairment of future earning capacity resulting from a personal injury, the plaintiff was entitled to gross rather than net wages. The Court stated:

> There are several schools of judicial thought on the matter but the more general view is that in fixing damages for accrued loss of earnings or for impairment of future earning capacity because of person-

al injuries, the income tax consequences of the injury and the award should not be taken into consideration; on the contrary, the award of damages should be based upon the plaintiff's gross earnings or earning capacity and should not be reduced because of any income tax saving which may result to the plaintiff from the fact that the damages will be exempt from income tax[. . . .] Courts so ruling have rather generally considered that income tax liability or saving is a matter not pertinent to the damages issue, being a matter between the plaintiff and the taxing authority, of no legal concern to the defendant; that the amount of income tax which might become due on one's prospective earnings in future years is too conjectural to be considered in fixing damages; or that to introduce the income tax matter into a lawsuit for damages would be unduly complicating and confusing[.]

Our view is in accord with the indicated general view. . . .

*Crum v. Ward,* 146 W.Va. at 443–44, 122 S.E.2d at 31 (*quoting* Annotation, 63 A.L.R.2d 1393 [1959][9]).

Furthermore, in *Flannery,* the Court employed reasoning nearly identical to that used in *Crum* to explicitly hold that a plaintiff is entitled to recover for the loss of gross future earning capacity rather than net future earning capacity. The Court began by finding that "a majority of courts have concluded that the plaintiff's future loss of earnings should not be subject to a deduction for the impact of federal income taxes." *Flannery v. U.S.,* 171 W.Va. at 34, 297 S.E.2d at 440. The Court then cited to the above-quoted text from *Crum,* indicating that taxes are a matter between the plaintiff and the taxing authority, not the defendant. Finally, the Court concluded that "[t]he main reason advanced by most courts in refusing to take income tax consequences into consideration in fixing damages for impairment of earning capacity is that the amount of one's future income tax liability is too conjectural or speculative." *Id.*

Our holdings in *Crum* and *Flannery* continue to be consistent with the overwhelming majority of jurisdictions. As one leading commentator summarizing the current law states:

When the plaintiff is employed for wages or on salary, the evidence which is used to evaluate the impairment of his or her earning capacity is gross wages and not "take-home" pay. The measure of damages for a wage loss is the gross amount of wages lost by the plaintiff, and thus income taxes, Social Security, retirement contributions or other withholdings may not be used to reduce the recovery.

Jacob A. Stein, 2 *Stein on Personal Injury Damages* § 6:17 (3d Edition 1997). Another commentator summarized the law thusly:

A majority of states holds that instructing the jury that damages are tax-free is improper. These states usually base their reasoning on two contentions: (1) bringing tax issues into calculations would open a "Pandora's Box" of collateral considerations, and (2) instructing the jury about income tax would contradict congressional intent in granting the tax exemption.

Todd C. McKee, "Comment: *Klawonn v. Mitchell:* Does a Refusal to Instruct a Jury That Wrongful Death Damages are Excluded From Income Taxation Make the Jury's Task Simpler or More Difficult?", 19 Am.J. Trial Advoc. 211, 215–16 (1995).

 Reading *Crum* and *Flannery* together, we believe that the circuit court was correct and believe that our law, as discussed by the Court in *Crum,* is clear: "in fixing damages for accrued loss of earnings or for impairment of future earning capacity because of personal injuries, the income tax consequences of the injury and the award should not be taken into consideration; on the contrary, the award of damages should be based upon the plaintiff's gross earnings or earning capacity[.]" *Crum v. Ward,* 146 W.Va. at 443–44, 122 S.E.2d at 31. In other words, a plaintiff's income taxes, Social Security and Medicare payments, vacation fund payments, health and life insurance premi-

---

**9.** The Annotation relied upon by the Court in *Crum* has since been superseded by a newer Annotation. *See* John E. Theuman, "Propriety of Taking Income Tax Into Consideration in Fixing Damages in Personal Injury or Death Action," 16 A.L.R.4th 589 (1982).

ums, Christmas club deductions, union dues, and so forth should not be accounted for when assessing a plaintiff's loss of earnings or earning capacity.

■ We therefore hold that, in calculating a plaintiff's damages for accrued loss of earnings or for impairment of future earning capacity because of personal injuries, the award of damages should be based upon the plaintiff's gross earnings or earning capacity and should not be reduced because of any income tax or other paycheck-type deduction. This method of calculation is applicable both to the parties for purposes of settlement, and to the finder of fact during a trial. The circuit court's order is therefore affirmed on this point.

Appellant Liberty Mutual's second argument is that, even if West Virginia law allows a plaintiff to recover gross wages, an insurance company's attempt to settle a lost wage claim for a lesser amount does not necessarily constitute a *per se* violation of the Unfair Trade Practices Act. The appellant contends that the circuit court erred in making a blanket conclusion in this case that the appellant's actions, as a matter of law and irrespective of the factual circumstances of the parties, established that it was "[n]ot attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." *W.Va.Code,* 33–11–4(9)(f).

■ In *Jackson v. State Farm Mut. Auto. Ins. Co.,* 215 W.Va. 634, 600 S.E.2d 346 (2004), we recently analyzed several portions of the UTPA that utilized language requiring an assessment of whether an insurance company's conduct was "reasonable." For instance, we concluded at Syllabus Point 2 of *Jackson* that:

> Liability is "reasonably clear," as stated in *W.Va.Code,* 33–11–4(9)(f) [2002], when a reasonable person, with knowledge of the relevant facts and law, would conclude, for

good reason, that the defendant is liable to the plaintiff.

We went on in Syllabus Point 3 of *Jackson* to conclude that the reasonableness of an insurance company's conduct "ordinarily [is a] question[ ] of fact for the jury" that should not be determined as a matter of law by a trial court.[10]

The circuit court in the case at bar concluded that Liberty Mutual had failed to make a "fair and equitable settlement[ ]" offer under *W.Va.Code,* 33–11–4(9)(f). More importantly, we perceive that the circuit court cast its ruling in such a broad manner that the issue of whether an insurance company made a "fair" settlement offer or an "equitable" settlement offer to resolve a lost wage claim could never be a question of fact for a jury; regardless of the variables that entered into the calculation of the parties' demands and offers, the issue would always be a question of law for the trial court. We believe that the circuit court's ruling improperly establishes what is "fair and equitable" as a question of law, when in fact the issue is ordinarily one of fact for the jury.

The terms "fair" and "equitable" are generally defined in ways that are synonymous and subjective. "Fair" is defined by *Black's Law Dictionary* as "[h]aving the qualities of impartiality and honesty; free from prejudice, favoritism, and self-interest. Just; equitable; even-handed; equal, as between conflicting interests."[11] *Webster's* similarly defines "fair" as something "characterized by honesty and justice; free from fraud, injustice, prejudice, or favoritism; ... having a certain basis in evidence or of reason; ... being a sufficient, equitable, or adequate basis for judgment or evaluation."[12]

"Equitable" is defined as "characterized by equity; fair to all concerned ..; without prejudice, favor, or rigor entailing undue

---

**10.** We stated, in Syllabus Point 3 of *Jackson,* that:

> Whether an insurer refused to pay a claim without conducting a reasonable investigation based on all available information under *W.Va. Code,* 33–11–4(9)(d) [2002], and whether liability is reasonably clear under *W.Va.Code,* 33–

11–4(9)(f) [2002] ordinarily are questions of fact for the jury.

**11.** *Black's Law Dictionary* at 535 (5th Ed.1980).

**12.** *Webster's Third New International Dictionary* at 815 (1970).

hardship" by *Webster's Dictionary,*[13] while *Black's Law Dictionary* says it means "[j]ust; conformable to the principles of justice and right."[14] Professor Garner's *Dictionary*[15] says that equitable "derives from equity, and has associations of justice and fairness ... To laymen it generally means 'fair' ..."

*Webster's Dictionary* equates the two words as synonyms, saying that fair and equitable

> can apply, in common, to judgments, judges, or acts resulting from judgments, and signify freedom from improper influence. FAIR, the most general of the terms, implies a disposition in a person or group to achieve a fitting and right balance of claims or considerations that is free from undue favoritism even to oneself, or implies a quality or result in an action befitting such a disposition.... EQUITABLE implies fair and equal treatment of all concerned[.]

*Webster's Third New International Dictionary* at 815 (1970).

When the Legislature chose to adopt the phrase "fair and equitable settlements of claims" in *W.Va.Code,* 33–11–4(9)(f), we presume that it intended a layman's common, ordinary interpretation of "fair" and "equitable." "In the absence of any definition of the intended meaning of words or terms used in a legislative enactment, they will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which they are used." Syllabus Point 1, *Miners in General Group v. Hix,* 123 W.Va. 637, 17 S.E.2d 810 (1941). *In accord,* Syllabus Point 6, in part, *State ex rel. Cohen v. Manchin,* 175 W.Va. 525, 336 S.E.2d 171 (1984) ("Undefined words and terms used in a legislative enactment will be given their common, ordinary and accepted meaning.")

We therefore apply a layman's interpretation to the Act, and hold that a "fair and equitable settlement[ ]" under *W.Va.Code,* 33–11–4(9)(f) is a settlement that is made by an insurer impartially, honestly, and free from prejudice, self-interest or other improper influence. Such a settlement implies a disposition of a claim for an element of damages that has a basis in evidence and in reason, and achieves a fitting and right balance of considerations that is free from favoritism, and is fair and equal to all concerned. Whether an insurer has made a fair and equitable settlement offer is ordinarily a question of fact for the jury.

The circuit court in this case concluded that, when liability is reasonably clear, a fair and equitable settlement offer is one where the insurer offers an amount that reflects the reasonable value of the specific item of damages claimed under the applicable law. The appellees argue that this interpretation is correct, and argue that when an insurer offers an amount that is in any way less than the claimed reasonable value of the specific item of damages, as a matter of law the insurer has violated the Unfair Trade Practices Act. While the appellees' argument has theoretical appeal, we are not persuaded because we perceive that the circuit court in this case failed to read *W.Va.Code,* 33–11–4(9)(f) in connection with our standard rules concerning summary judgment. "Under Rule 56(c) of the West Virginia Rules of Civil Procedure, summary judgment is proper only where the moving party shows that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law." *Painter v. Peavy,* 192 W.Va. at 192, 451 S.E.2d at 758.

Our concern with the circuit court's ruling is particularly in those circumstances where the facts are less black-and-white, and more in the gray. We are troubled that the circuit court's ruling imposes a *per se* finding of a violation of the Unfair Trade Practices Act even in those instances where there is a genuine issue of material fact regarding the reasonable value of the specific item of damages claimed under the applicable law.

**13.** *Webster's Third New International Dictionary* at 679.

**14.** *Black's Law Dictionary* at 482.

**15.** Bryan A. Garner, *A Dictionary of Modern Legal Usage* at 219 (Oxford 1987).

The appellees, in their brief to this Court, concede that there are many instances where the calculation of a plaintiff's damages involves many variables, such that the damages can be negotiated and settled for an amount less than that which is asserted and provable. We agree with the appellees that under *W.Va.Code,* 33–11–4(9)(f), when a plaintiff's claim for loss of accrued earnings as a result of a personal injury is indefinite in amount, unliquidated, or not ascertainable by calculation; the causation for the loss is disputable; or the liability, or degree thereof, of the insured to the plaintiff is disputable, then an insurance company does not, as a matter of law, violate the Unfair Trade Practices Act when it accounts for these factors and offers to settle the claim for an amount less than the plaintiff's asserted loss of accrued earnings. We believe that this properly interprets *W.Va.Code,* 33–11–4(9)(f), and that the circuit court erred in adopting what amounts to a *per se* rule that does not account for these variables.

The circuit court in the instant case held, as a matter of law, that "an insurance company's offering or settling for net wages . . . is a prohibited practice under the Unfair Trade Practices Act[.]" We believe that this broad holding exceeds the language of the Act, and disregards the prospect that—in certain circumstances—genuine issues of fact regarding whether an insurance company's conduct in offering less than a plaintiff's full wages may be considered "fair," "equitable," and "reasonable." Before a trial court may find that an insurance company has violated the Act as a matter of law, it must first determine that the insurance company's offer of settlement unquestionably was made without regard to the aforementioned circumstances of the parties; otherwise, the determination should be left for jury resolution.

The circuit court failed to do so in this case. The circuit court in this case found no material questions of fact, when the circumstances of the parties indicate otherwise. In this case, the question of whether the appellant violated the Unfair Trade Practices Act is a question of fact for jury resolution. The circuit court's order must therefore be reversed and remanded on this issue.

## IV.

### *Conclusion*

The circuit court's order of December 10, 2003, is affirmed, in part, and reversed, in part, and the case is remanded for further proceedings not inconsistent with this opinion.

Affirmed, in part, Reversed, in part, and Remanded.