705 S.E.2d 572

**Sharon JAMES and Glen Nelson, Plaintiffs Below, Appellees**

v.

**Vivian KNOTTS and Betty Nelson, Defendants Below, Appellants.**

No. 35482.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 12, 2010.

Decided Nov. 18, 2010.

66

John F. Hussell, IV, Esq., Katie L. Monroe, Esq., Dinsmore & Shohl, LLP, Charleston, WV, for Vivian Knotts.

Orton A. Jones, Esq., Hedges, Jones, Whittier & Hedges, Spencer, WV, for Betty Nelson.

Barbara Harmon–Schamberger, Esq., Clay, WV, for Sharon James and Glen Nelson.

PER CURIAM:

The appellants and defendants below, Vivian Knotts and Betty Nelson, appeal a final order of the Circuit Court of Clay County entered on June 12, 2009, denying their mo-

tion for judgment notwithstanding the verdict or, in the alternative, motion for a new trial in this civil action filed by their siblings, the appellees and plaintiffs below, Sharon James and Glen Nelson, challenging the last will and testament of their mother, Irene Triplett Nelson, based upon a lack of testamentary capacity and undue influence. Following a three-day trial, the jury returned a verdict in favor of the appellees finding that Irene Nelson lacked testamentary capacity and was unduly influenced when she executed her will on July 29, 2005.

In this appeal, the appellants assert several assignments of error but primarily contend that the circuit court erred by denying their motion for judgment not withstanding the verdict, or in the alternative, motion for a new trial. This Court has before it the petition for appeal, the entire record, and the briefs and argument of counsel. For the reasons set forth below, the final order is reversed, and this case is remanded to the circuit court with directions to enter judgment notwithstanding the verdict in favor of the appellants.

## I.

### FACTS

Irene Triplett Nelson, a resident of Clay County, West Virginia, died on April 29, 2006. She was preceded in death by her husband, Virgle Nelson, and a daughter, Nancy Nelson. Irene Nelson was survived by four children, Vivian Knotts and Betty Nelson, the appellants and defendants below, and Sharon James and Glen Nelson, the appellees and plaintiffs below. Irene Nelson was also survived by eight grandchildren including Whitney Nelson, the daughter of Nancy Nelson.

On May 1, 2006, Irene Nelson's last will and testament was admitted to probate by the County Commission of Clay County, and the appellants were qualified as co-executrixes of the estate. On September 18, 2006, this civil action was filed by the appellees seeking to set aside and revoke the order of the County Commission of Clay County granting the probate of the will. The appellees asserted that their mother lacked testa-

mentary capacity and was unduly influenced when she executed her will on July 29, 2005. Thereafter, the matter was remanded to the County Commission for reconsideration, and following a hearing, the County Commission denied the presentation of the last will and testament of Irene Nelson for probate, effectively removing the appellants from their previously appointed positions as co-executrixes of the estate. The appellants appealed the decision to the circuit court. The appellants then filed motions for summary judgment which were denied.

A jury trial commenced on October 2, 2008. Following three days of testimony, the jury returned a verdict in favor of the appellees, finding that Irene Nelson lacked the requisite testamentary capacity to execute her last will and testament on July 29, 2005, and that the will was a product of undue influence by the appellants. Subsequently, the appellants filed a motion for judgment notwithstanding the verdict or, in the alternative, motion for a new trial. The motion was denied by the circuit court by order entered June 12, 2009. This appeal followed.

## II.

### STANDARD OF REVIEW

■■■■ In Syllabus Point 3 of *Pipemasters, Inc. v. Putnam County Comm'n,* 218 W.Va. 512, 625 S.E.2d 274 (2005), this Court held:

"The standard of review recited in Syllabus Point 1 in *Mildred L.M. v. John O.F.,* 192 W.Va. 345, 452 S.E.2d 436 (1994) and in Syllabus Point 1 in *Barefoot v. Sundale Nursing Home,* 193 W.Va. 475, 457 S.E.2d 152 (1995), and their progeny, is clarified to read as follows: In reviewing a trial court's denial of a motion for judgment notwithstanding the verdict, it is not the task of the appellate court reviewing facts to determine how it would have ruled on the evidence presented. Its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, in ruling on a denial of a motion for judgment notwithstanding the verdict, the evidence must be viewed in the light most favorable to the nonmoving party. If on review, the

evidence is shown to be legally insufficient to sustain the verdict, it is the obligation of the appellate court to reverse the circuit court and to order judgment for the appellant." Syllabus Point 1, *Alkire v. First National Bank of Parsons*, 197 W.Va. 122, 475 S.E.2d 122 (1996).

This Court also explained in Syllabus Point 4 of *Pipemasters* that

"in determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved." Syllabus Point 5, *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983), *cert. denied*, 469 U.S. 981, 105 S.Ct. 384, 83 L.Ed.2d 319 (1984).

Finally, this Court advised that " '[a]n appellate court will not set aside the verdict of a jury, founded on conflicting testimony and approved by the trial court, unless the verdict is against the plain preponderance of the evidence.' Syllabus Point 2, *Stephens v. Bartlett*, 118 W.Va. 421, 191 S.E. 550 (1937)." Syllabus Point 5, *Pipemasters*.

## III.

## DISCUSSION

As discussed above, the appellants contend that the circuit court erred by denying their motion for judgment notwithstanding the verdict or, in the alternative, motion for a new trial. This Court has held:

In order to assert a motion for judgment notwithstanding the verdict under Rule 50(b) of the West Virginia Rules of Civil Procedure, a defendant must move for a directed verdict at the close of the plaintiff's case and assert therein the insufficiency of the evidence to establish a *prima facie* case. A similar motion for a directed verdict must be made at the close of all the evidence. Finally, the motion for judgment notwithstanding the verdict must be filed within ten days from the date of the entry of the judgment order on the jury verdict.

Syllabus Point 5, *Huffman v. Appalachian Power Co.*, 187 W.Va. 1, 415 S.E.2d 145 (1991). The record shows that the appellants made a motion for a directed verdict at the close of the appellees' evidence and a similar motion at the close of all the evidence. They also timely submitted their motion for judgment notwithstanding the verdict. The appellants argue in their brief that the circuit court erred in denying all of these motions. In considering each motion, the circuit court was required to determine whether there was a legally sufficient evidentiary basis for a reasonable jury to reach a decision in favor of the non-moving party. In that regard, this Court has held:

In considering whether a motion for judgment notwithstanding the verdict under Rule 50(b) of the West Virginia Rules of Civil Procedure should be granted, the evidence should be considered in the light most favorable to the plaintiff, but, if it fails to establish a *prima facie* right to recover, the court should grant the motion.

Syllabus Point 6, *Huffman.*

The appellants argue that the evidence presented at trial by the appellees not only failed to establish a *prima facie* right to recovery but actually proved that their mother was of sound mind and disposing memory when she executed her will on July 29, 2005. The appellants maintain that the appellees presented no evidence to show that their mother lacked testamentary capacity to execute her will or that the will was a product of undue influence.

Long ago, in Syllabus Point 3 of *Stewart v. Lyons*, 54 W.Va. 665, 47 S.E. 442 (1903), this Court held:

It is not necessary that a testator possess high quality or strength of mind, to make a valid will, nor that he then have as strong mind as he formerly had. The mind may be debilitated, the memory enfeebled, the understanding weak, the character may be peculiar and eccentric, and he may even want capacity to transact many of the business affairs of life; still it

is sufficient if he understands the nature of the business in which he is engaged when making a will, has a recollection of the property he means to dispose of, the object or objects of his bounty, and how he wishes to dispose of his property.

In Syllabus Point 4 of *Lyons*, this Court explained that "[w]hen incapacity of a testator is alleged against a will, the vital question is as to his capacity of mind at the time when the will was made." In other words, "[t]he time to be considered in determining the capacity of the testator to make a will is the time at which the will was executed." Syllabus Point 3 of *Frye v. Norton*, 148 W.Va. 500, 135 S.E.2d 603 (1964). Therefore, " '[e]vidence of witnesses present at the execution of a will is entitled to peculiar weight, and especially is this the case with the attesting witnesses.' Point 2, Syllabus, *Stewart v. Lyons*, 54 W.Va. 665 [47 S.E. 442 (1903) ]." Syllabus Point 4, *Frye*. "[T]estimony relating to a testator's condition generally before and after the will is signed is of little or no probative value." *Frye*, 148 at 511, 135 S.E.2d at 610.

■■■ With respect to undue influence, this Court held in Syllabus Point 5 of *Lyons* that "[u]ndue influence, to avoid a will, must be such as overcomes the free agency of the testator at the time of actual execution of the will." This Court explained:

The influence resulting from attachment or love, or mere desire of gratifying the wishes of another, if free agency is not impaired, does not affect a will. The influence must amount to force or coercion destroying free agency. It must not be the influence of affection or attachment. It must not be mere desire of gratifying the wishes of another, as that would be strong ground to support the will. Further, there must be proof that it was obtained by this coercion, by importunity that could not be resisted; that it was done merely for the sake of peace, so that the motive was tantamount to force and fear.

Syllabus Point 6, *Lyons*. Consequently, Syllabus Point 7 of *Lyons* provides that "[t]he

will of a person of competent testamentary mind and memory is not to be set aside on evidence tending to show only a possibility or suspicion of undue influence."

The record shows that Irene Nelson executed her will on July 29, 2005, in Charleston, West Virginia. The will was drafted by attorney William C. Forbes and was signed at the First Bank of Charleston. The will was notarized and witnessed by bank employees. The entirety of Irene Nelson's estate, both real and personal property, was left to the appellants.

Prior to the execution of the will, several disputes arose within the Nelson family. These disputes occurred after the death of Nancy Nelson. The record indicates that Nancy Nelson died from gunshots wounds on September 13, 2004. Her ex-husband, Larry Thomas was charged and convicted of first degree murder. Thereafter, appellee Sharon James and appellant Betty Nelson both sought custody of Whitney Nelson, Nancy's only child. Eventually, Sharon James was granted custody of Whitney. Irene Nelson then filed a lawsuit against Sharon James seeking grandparent visitation rights.[1] At trial, the appellees asserted that the appellants isolated and controlled Irene Nelson after Nancy Nelson was murdered and that her will was a result their undue influence. They asserted that Irene Nelson's actions during the course of Larry Thomas's trial demonstrated that she lacked testamentary capacity. The appellants maintained, however, that these disputes and the disharmony that resulted therefrom were the reason that Irene Nelson excluded the appellees from her will.

In determining whether Irene Nelson lacked testamentary capacity and/or was unduly influenced when she executed her will, all of the evidence relating thereto must be considered. While numerous witnesses testified at trial, only a few actually observed Irene Nelson around the time the will was executed. In that regard, the appellees presented the testimony of Josyln Truett and Sherry Strickland McCormick. Ms. Truett

---

1. The record indicates that the custody battle between Sharon James and Betty Nelson occurred before the will was signed and that Irene Nelson sought grandparent visitation rights after the will was executed.

is a vice-president at the First Bank of Charleston, and she notarized Irene Nelson's will. She testified that she had not previously met Irene Nelson and had no personal knowledge of her. On cross-examination, Ms. Truett stated that she was confident that Irene Nelson was of sound mind and disposing memory when she executed her will on July 29, 2005. She told the jury that she and one of the attesting witnesses had a twenty-minute conversation with Irene Nelson after the will was signed about sewing and quilting and that Irene Nelson also mentioned her four children. Ms. Truett said that Irene Nelson came into the bank alone and that she did not believe that anyone was coercing her to sign the will. Likewise, Ms. McCormick, a bank teller and one of the attesting witnesses, testified that Irene Nelson came to the bank alone. Ms. McCormick indicated that she did not really remember anything else that occurred on the day the will was executed.

The other witnesses who testified on behalf of the appellees were unable to say that they had actually observed Irene Nelson around the time that the will was executed. The appellees relied heavily on the testimony of Mary Jane Blankenship who had resided for several years across the road from Irene and Virgle Nelson. She testified that she was good friends with Irene Nelson and that they went places together. She believed that Irene Nelson drove too fast. She talked about playing the game "Yahtzee" with Irene Nelson during the evenings for many years but stated that they quit playing around 1993 because Irene "couldn't concentrate" anymore. Ms. Blankenship said that Irene Nelson's health "began to fail" as she got older and that she was in "pitiful shape" and sometimes "confused." On cross-examination, Ms. Blankenship stated, "She didn't lose her mind. She was just confused, so I'm not insinuating that she was crazy."

Ms. Blankenship further testified that one of her trips with Irene Nelson was to Summersville where Irene considered buying a modular home. Irene told Ms. Blankenship that she had $60,0000 but needed an additional $8,000.00 to make the purchase. On another occasion, they went to Summersville so that Irene Nelson could go to the Veteran's Administration Office to deal with matters concerning her late husband's pension. On cross-examination, Ms. Blankenship acknowledged that Irene Nelson was handling her own business affairs. She also testified that she did not speak to Irene Nelson on July 29, 2005, and that she did not know anything about the will.

The appellees also presented testimony from James Samples, the prosecuting attorney of Clay County. Mr. Samples was the prosecutor when Larry Thomas was tried and convicted of the murder of Nancy Nelson. He read to the jury the statement that Irene Nelson made at Larry Thomas's sentencing hearing. At that time, Irene Nelson indicated that she was not sure that Larry Thomas had murdered her daughter.[2] When asked about Irene Nelson's mental competency and whether she had the testamentary capacity to make a will, Mr. Samples stated, "I thought some of her statements were inconsistent with each other. I can't say that I

2. Mr. Samples read the following statement to the jury in the instant case which was made by Irene Nelson at Larry Thomas's sentencing hearing:

Irene: Yes, I wrote it down, so I wouldn't forget ... and, I don't want to cry, but, I probably will. I just want to say a few words in regard to Larry's character. I've always regarded Larry as a kind hearted, easy going, good natured person. I've never seen hatred, hatefulness, vengeful—or vengeance, or greed in his nature. I'm not satisfied with the outcome of the trial and the lack of investigative follow up. It didn't give me closure. I hoped that I would actually learn something that would satisfy my soul, I guess. And when the answers turned out, not to be Larry. No other answer was sought. I did

not get satisfaction in regard to his innocence or guilt, it failed to establish a motive, and certainly did not prove premeditation. I cannot believe there was any. The proceeding was filled with lies and collaborated testimonies. If Larry did commit this shooting, something with him ... in him severely malfunctioned. The crime is not of his nature. It was not that he suddenly became a cold-hearted murderer at the age of 61 years. Without a previous record of such behavior ... I feel actually that ... the punishment does not fit the crime. For those who do not have Christ in them. It's easy to point a finger at somebody else. And I have had more than 15 months ... terrible, terrible things since Nancy died. And, all I can do is just pray to God somehow, give me peace. That's all I have to say.

ever thought she was out-right crazy or anything like that[.]" Mr. Samples indicated that he would defer to Mr. Forbes's opinion regarding Irene Nelson's testamentary capacity on the day she executed her will.

Appellee Glen Nelson testified that he only spoke with his mother one time after his father died.[3] He said that he and his mother never visited or talked to each other even though they only lived 600 feet apart. Appellee Sharon Nelson testified that she was close to her mother before her sister died, but that after Nancy was murdered their relationship deteriorated because of the custody battle over Whitney Nelson. Sharon Nelson acknowledged that she filed a motion for injunctive relief in the Circuit Court of Clay County seeking to prevent her mother from having any further contact with her.

In addition to the evidence discussed above, the appellees presented testimony from several other witnesses who had known Irene Nelson for several years. As previously noted, however, none of these witnesses testified about Irene Nelson's mental state around the time the will was signed. In contrast, the appellants presented the testimony of several witnesses who observed and talked with Irene Nelson when the will was executed.

The appellants' first witness was Julie Wilson, the other attesting witness to the will. She testified that while she had never met Irene Nelson prior to July 29, 2005, she was very confident that Irene Nelson was of sound mind and disposing memory at the time she signed the will. Ms. Wilson told the jury that she had a pleasant conversation with Irene Nelson after the will was signed and that Irene Nelson did not appear to be under any undue stress. Ms. Wilson further testified that no one came to the bank with Irene Nelson, and she did not believe that she was coerced into signing the will.

The appellants then presented the testimony of Mr. Forbes, the attorney who drafted the will. Mr. Forbes testified that he had numerous conversations and meetings with Irene Nelson. In addition to drafting her will, he also represented Irene Nelson in the

civil action she filed seeking grandparent visitation rights with Whitney Nelson. He stated that he had no reservations concerning Irene Nelson's testamentary capacity and that all the information for drafting the will regarding how the property was to be divided and distributed came directly from Irene Nelson. He testified:

> I don't know how you describe what was going on, and I really wasn't involved in the first series of rancor and hurt feelings and abuse that happened in this family, I wasn't privy to that. By the time Irene got to me, she was—It was a mixture of things. She was angry at the way she had been treated. She was extremely hurt—
>
> And—I'm not—I'm a father. I'm not a mother but I can imagine if one of my kids was saying the kinds of things that they said about her, that I would be deeply hurt.
>
> —and she was deeply hurt and offended by the lack of contact with the grandparents, and she ascribed some very bad motives to the people on the other side of that.
>
> So what she wanted to do was to distribute her estate to the kids that liked her and honored her and respected her and treated her fairly and not reward the ones that were abusing her[.]

Mr. Forbes further testified regarding the content of the will, stating, "They're her words and her desires, and if you knew Irene, nobody could influence Irene. She did what she wanted to do, and she was a very bright, intelligent woman."

Next, Vickie Lou Leighton testified. She was a close friend of Nancy Nelson and knew Irene Nelson since 1976. Ms. Leighton testified that Irene Nelson contacted her after Nancy's death and asked her to help her rewrite her will. Irene indicated that she did not want any family members involved. Ms. Leighton told the jury that Irene Nelson wanted to make changes to her will because of the events that occurred after Nancy's death, in particular, the custody fight concerning Whitney Nelson. Ms. Leighton stated that she made several trips to Irene Nel-

---

3. Virgle Nelson died in May 2005.

son's home to help her draft the will. She said that "I just sat at the table and wrote what she told me … we did that until she finally got it the way she felt comfortable with at the time." Ms. Leighton said that Irene did not know of an attorney so she found Mr. Forbes's name and number and gave it to her. When asked about Irene Nelson's decision to leave all of her assets to the appellants, Ms. Leighton stated, "That was totally her idea, totally."

Thomas Wayne Hannigan also testified on behalf of the appellants. He is in the financial services business and has an office in Charleston, West Virginia. Mr. Hannigan testified that he assisted Irene Nelson in filing insurance claims after the deaths of her daughter and her husband. He also assisted her with re-investing some of the proceeds therefrom. Mr. Hannigan met with Irene Nelson four or five times and spoke to her by phone on four to six occasions. Many of his discussions with Irene Nelson occurred during the summer of 2005. Mr. Hannigan testified that Irene Nelson knew who her family was and the assets she owned. He believed that Irene Nelson was competent to determine how she wished to dispose of her assets.

■■■ The appellants also presented testimony from two other witnesses, one friend and one family member, who each testified that Irene Nelson told them that she had changed her will because of the way the appellees treated her following the death of Nancy Nelson. The appellants' last witness was Bruce Stout, an attorney who was qualified as an expert in the field of wills and estates. Mr. Stout testified to a reasonable degree of legal certainty that Mr. Forbes took the appropriate precautions to ensure that Irene Nelson had the requisite testamentary capacity to execute her will on July 29, 2005. Having heard all the testimony presented at trial, Mr. Stout opined that

Irene Nelson was not unduly influenced and that her will reflected her intent with respect to the disposition of her assets.[4]

■■■ After hearing all the evidence, the jury returned a verdict in favor of the appellees finding that Irene Nelson was unduly influenced and lacked testamentary capacity to execute her will. Upon review, however, considering all evidence in the light most favorable to the non-moving party, the appellees, this Court finds that the verdict rendered by the jury in this case was against the preponderance of the evidence. In fact, this Court finds that there was overwhelming evidence in the record that Irene Nelson possessed the requisite testamentary capacity when she executed her will on July 29, 2005. Moreover, there was virtually no evidence submitted on the issue of undue influence. The only evidence presented by the appellees to support their claim that Irene Nelson was unduly influenced when she executed her will was the fact that the husband of appellant Vivian Knotts drove Irene Nelson to Charleston on the day she executed her will. Such evidence certainly does not satisfy the standard of proof required under *Stewart, supra.*[5]

■■■ With respect to testamentary capacity, all of the witnesses who observed and talked with Irene Nelson when the will was executed, particularly the attesting witnesses and the attorney who drafted the will, testified that she was of sound mind and disposing memory on July 29, 2005. Contrary to the appellees' assertion, the testimonies of Mary Jane Blankenship and James Samples do not demonstrate that Irene Nelson lacked testamentary capacity. Rather, Ms. Blankenship's testimony showed that Irene Nelson was handling her own business affairs as she was negotiating to buy a modular home and dealing with matters concerning her late husband's estate.[6] Mr. Samples' testimony that

---

4. Mr. Stout's testimony was objectionable to the extent that he testified that Irene Nelson's will was valid. *See Jackson v. State Farm Mut. Auto. Ins. Co.*, 215 W.Va. 634, 600 S.E.2d 346 (2004) (holding that an expert may not give his or her opinion on a question of law). No objection was made at trial, however, and the issue is not before this Court in this appeal.

5. In the final order, the circuit court found that the evidence presented on the issue of undue influence was "scant." The court then stated that the issue was rendered moot because the jury found that the will was invalid because Irene Nelson lacked testamentary capacity.

6. While the ability to conduct one's business affairs supports a finding of competency, it has been held that "[m]erely because a testator may

Irene Nelson took a position that was contrary to the evidence concerning Larry Thomas's guilt with respect to the murder of Nancy Thomas in no way indicates that she was incompetent to make a will. Instead, the fact that Irene Nelson was able to make a statement at Larry Thomas's sentencing hearing shows that she was capable of understanding the nature of legal matters and acting in accordance with her beliefs.

This Court has long since held that " ' "[w]here legal capacity is shown, and the testator acts freely, the validity of the will can not be impeached, however unreasonable, imprudent, or unaccountable it may seem to the jury or to others." Point 3, Syllabus, *Nicholas v. Kershner,* 20 W.Va. 251 [1882].' Point 12, Syllabus, *Ritz v. Kingdon,* 139 W.Va. 189 [79 S.E.2d 123 (1953) ]." Syllabus Point 7, *Frye.* The evidence presented at the trial in this case was legally insufficient to sustain the jury's verdict. Irene Nelson clearly possessed the requisite testamentary capacity to execute her will. The appellants are therefore entitled to judgment notwithstanding the verdict.[7]

## IV.

### CONCLUSION

Accordingly, for the reasons set forth above, the final order of the Circuit Court of Clay County entered on June 12, 2009, is reversed, and this case is remanded to the circuit court with directions to enter an order granting judgment notwithstanding the verdict in favor of the appellants.

Reversed and remanded with directions.

Justice KETCHUM concurs and reserves the right to file a concurring opinion.

KETCHUM, J., concurring:

*An expensive egg opines again.*

I agree with the majority's finding that the plaintiff presented no evidence as to the tes-tator's lack of testamentary intent or undue influence.

I am writing separately to point out that this is yet another case verifying my theory that "[r]etained experts are like eggs. You can buy them by the dozen—they are just more expensive." *Perrine v. E.I. du Pont de Nemours and Co.,* 225 W.Va. 482, 582, 694 S.E.2d 815, 915 (2010) (Ketchum, J., dissenting, in part, and concurring, in part).

Time and again, I see lawyers presenting "experts" who testify about matters that are easily within the everyday knowledge and experience of a lay juror. This unwarranted testimony adds great expense to the litigants, and lines the pockets of self-proclaimed experts. It is bad enough that litigants must pay exorbitant hourly rates to lawyers, much less pay fees for unnecessary expert testimony in their search for justice.

In this case, a lawyer was hired as a paid expert to testify as to the intent of the decedent, and whether undue influence was exerted upon the decedent. Are juries so dumb that they must hear a hired lawyer's expert opinion as to a person's "intent" or "undue influence"? Pretty soon expert lawyers will be paid to opine as to which car ran the red light in traffic accident cases, and what each car driver was thinking during the collision.

I wonder, how much did this egg cost the appellant? How can a "big city" lawyer from Huntington be allowed to testify in rural Clay County about a testator's intent to make a will, and whether the testator was acting under some influence that was undue? The law is clear that an expert's opinion evidence is inadmissible on any matter to which the jury is as competent to render an opinion as a paid lawyer expert from Huntington. *See* Syllabus Point 7, *Lawrence Adm'r v. Hyde,* 77 W.Va. 639, 88 S.E. 45 (1916). The law is just as clear that an

---

be incompetent to safely transact the general business affairs of life does not render him incompetent to make a will." Syllabus Point 8, *Stewart.*

7. The appellants asserted two additional assignments of error. They argued that the appellees should not have been permitted to present the testimony of James Samples because he was not timely disclosed as a witness pursuant to the scheduling order. They also asserted that the circuit court erred by denying their motion for summary judgment. In light of our decision above, it is not necessary to address these issues.

"expert opinion cannot be offered as to the subjective intent of an individual." Syllabus Point 3, *State v. Mitter*, 168 W.Va. 531, 285 S.E.2d 376 (1981).

At the rate we are going, we might as well abolish juries that decide everyday factual issues, and turn every case over to a panel of self-proclaimed experts to tell us what the litigants did and what they were thinking. At least, I think that's my thinking … or maybe you should pay for an expert lawyer to testify what *he* thinks I am thinking.