# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Richard Vincent Cantarelli,**
**Plaintiff Below, Petitioner**

**vs.)  No. 18-0839** (Harrison County 16-C-255)

**Myra Jan Grisso,**
**Defendant Below, Respondent**

**FILED**

**January 13, 2020**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Richard Vincent Cantarelli, by counsel Stephen A. Wickland, appeals the Circuit Court of Harrison County's August 29, 2018, order denying his motion to alter or amend the court's grant of summary judgment in respondent's favor on his tortious interference with a testamentary bequest claim and attempt to set aside his mother's will. Respondent Myra Jan Grisso, by counsel Daniel C. Cooper and Jamison H. Cooper, filed a response, and petitioner filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In March or April of 2016, respondent contacted Scott Wilson, an attorney, regarding obtaining a new will for her mother (the "decedent"). The decedent last executed a will in 1990 that provided that the parties, the decedent's children, would share equally in the decedent's estate; however, because petitioner previously received the family dental business, the decedent wished to leave respondent her home. Despite respondent's protestations that such an arrangement was "not going to work" and her attempts to "talk [her] mother out of it," the decedent insisted.

After the initial phone call with Mr. Wilson, respondent went to his office on April 19, 2016, to further discuss preparation of the new will. The decedent was unable to accompany respondent, however, due to her physically frail state. Mr. Wilson's first draft divided the decedent's estate equally between the parties, but when respondent took this draft to the decedent, the decedent reiterated that because petitioner received the business, respondent was to receive the home. Accordingly, Mr. Wilson prepared a second draft leaving the decedent's home to respondent.

1

After preparing the second draft, Mr. Wilson informed respondent that he needed to meet with the decedent. Mr. Wilson said to respondent, "you know, I don't want you there. I don't want to have any situation where, you know, that you're there sitting, trying to influence anything that she does." Therefore, respondent was not present during Mr. Wilson's meeting with the decedent. During that meeting, on April 29, 2016, Mr. Wilson and the decedent "chit-chatted a little bit," and then Mr. Wilson discussed "all of the provisions in the will" to "ascertain that [the decedent] was aware of what we were doing." Mr. Wilson stated that he met with the decedent for "at least an hour to go through everything." When Mr. Wilson and the decedent reached the provision in the will regarding the residence, Mr. Wilson recounted to the decedent that his first draft divided the estate equally, but that his later understanding was that the decedent wished to leave her home to respondent exclusively. Mr. Wilson stated that the decedent "more than once, said, 'Yes, I want [respondent] to get the house. [Petitioner] got the business, I want [respondent] to get the house.'" Although Mr. Wilson informed the decedent that "this is going to cause some problems . . . from what [respondent] has indicated to me," the decedent was insistent: "He [petitioner] got the business, I want her [respondent] to get the house." Accordingly, the decedent executed the will, and Mary Jo Strugarek and Sharon Morgan, two of the decedent's caretakers, witnessed the will's execution.

Mr. Wilson, who has prepared between two hundred and four hundred wills over his forty-two years of practice, believed the decedent to be of "sound and disposing memory. I thought she understood what she was wanting to do. . . . [S]he was well aware and she remembered things. And so I felt that she was mentally capable of executing a will at the time." Although the decedent was physically "very, very frail," Mr. Wilson believed that mentally "she understood what she was doing and was competent, in [his] opinion, to execute a will." Additionally, Mr. Wilson informed Ms. Strugarek and Ms. Morgan that, in witnessing the decedent's execution of the will, they were "swearing that . . . [the decedent] is of sound mind and disposing memory and over the age of [eighteen]." The caretakers indicated their willingness to sign as witnesses, and the three individuals "discussed the fact that, you know, they had been her long-time caregivers and that they felt comfortable that she was able to execute the will, that she understood what she was doing."

Ms. Morgan cared for the decedent for approximately six months to one year prior to the decedent's death. On the date the decedent executed her will, Ms. Morgan recalled her being "alert . . . she was definitely—was alert." To Ms. Morgan, the decedent appeared able to "know what she wanted to do" and did not have difficulty voicing her desires. Ms. Morgan had previously cared for others with dementia, including some who were not of sound mind to execute a will, but she believed the decedent to be of sound mind when she executed her will. Ms. Morgan also stated that she had heard the decedent express her intention to make a new will, outside of respondent's presence: "She was going to call her lawyer and have the will changed. . . . [S]he wanted [respondent] to have the house and the stuff in there. . . . She said because her son got the business and [respondent]—she wanted [respondent] to have the house."

Ms. Strugarek cared for the decedent for approximately one to one and a half years before the decedent's death. On the date the decedent executed her will, Ms. Strugarek recalled Mr. Wilson coming to the decedent's home with a notary. Ms. Strugarek stated that Mr. Wilson "went over the will with her" and "read it all to her," and she believed the decedent was "in her right

2

mind" when she executed the will. Ms. Strugarek was asked, "[A]t the time that she was expressing her desires with regard to the will, she didn't seem confused to you?" Ms. Strugarek responded, "Not at all" and agreed that the decedent "seemed to know precisely what she wanted." Ms. Strugarek also recalled the decedent stating that "she wanted [respondent] to have the house. . . . She said it was only fair that [respondent] get the house because [petitioner] got the company. . . . She was strong on him—on [respondent] getting the house and him getting the company."

The decedent passed away on June 3, 2016. On July 8, 2016, petitioner filed a complaint against respondent seeking to set aside the decedent's will.[1] Petitioner alleged that the decedent lacked testamentary capacity when she executed the will and that respondent exerted undue influence in procuring that will. Petitioner also asserted claims for tortious interference with his inheritance by respondent due to her "undue influence and duress" and breach of fiduciary duty.

The parties filed competing motions for summary judgment. In support of his motion and, in particular, his assertion that the decedent lacked testamentary capacity, petitioner relied on a May 24, 2013, determination by Dr. Stephen Fryer that the decedent was "incapacitated" as defined by West Virginia Code § 16-30-3(l), within the Health Care Decisions Act.[2] In making this determination, Dr. Fryer listed the cause as Alzheimer's disease, indicated that the nature included "impaired cognition, poor short term memory," and stated that the duration would be for the decedent's lifetime. As a result of this incapacity, respondent was appointed as the decedent's healthcare surrogate. Petitioner also relied on other medical documents in arguing that the decedent's Alzheimer's did not improve and that her "poor reasoning and short-term memory loss continued until her death."

On June 22, 2018, the circuit court granted respondent's motion for summary judgment, in part. The court concluded that the decedent's will was valid as she possessed testamentary capacity at the time she executed it and petitioner was unable to establish a genuine issue of material fact as to his claim of undue influence. The court supported its decision with references to Mr. Wilson's and the attesting witnesses' testimony. It further found that the "incapacity" determination for making healthcare decisions was remote in time to the execution of the will and had no bearing on a determination of testamentary capacity. Because petitioner's claim of tortious interference was predicated on respondent's alleged undue influence over the decedent, and because petitioner had produced no evidence of undue influence, the court also granted summary judgment in respondent's favor on that claim. The court, however, found that there were genuine issues of material fact regarding the remaining breach of fiduciary duty claim. The parties later resolved that claim, and it was dismissed by agreed order. The circuit court denied petitioner's motion to alter or amend its order granting respondent summary judgment on August 29, 2018, and this appeal followed.

---

[1] Petitioner also filed an amended complaint. The amended complaint asserted the same causes of action but eliminated allegations of fraud on respondent's part.

[2] Under West Virginia Code § 16-30-3(l), "incapacity" is defined as "the inability because of physical or mental impairment to appreciate the nature and implications of a health care decision, to make an informed choice regarding the alternatives presented, and to communicate that choice in an unambiguous manner."

This Court's review of a circuit court's entry of summary judgment is de novo.[3] *See* Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994). We have instructed that "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." *Id.*, syl. pt. 2 (citations omitted). Further,

> [s]ummary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.

*Id.*, syl. pt. 4.

Petitioner asserts three assignments of error on appeal. First, he argues that the decedent lacked free agency, rendering her will invalid. "Where legal capacity is shown, and the testator acts freely, the validity of the will cannot be impeached, however unreasonable, imprudent or unaccountable, it may seem to the jury or to others." Syl. Pt. 3, *Nicholas v. Kershner*, 20 W. Va. 251 (1882). Petitioner maintains that the decedent's free agency was "destroyed when the beneficiary direct[ed] the preparation of" the decedent's will.

In support, petitioner cites *Vaupel v. Barr*, 194 W. Va. 296, 299, 460 S.E.2d 431, 434 (1995), where this Court found no undue influence where there was "no evidence even remotely suggesting that the defendant actively procured" the will. Petitioner argues that, in contrast, respondent actively procured the decedent's will. He also cites *Greer v. Vandevender*, No. 16-1228, 2018 WL 798419 (W. Va. Feb. 9, 2018)(memorandum decision), in which we found no evidence of undue influence where, at the time the deceased executed her will, she was living alone, signing her own checks, and conveying other property. The decedent here, however, was dependent on others. Lastly, petitioner distinguishes *Printz v. Printz*, No. 13-0495, 2014 WL 1672984 (W. Va. Apr. 25, 2014)(memorandum decision). In that case, the attorney who prepared the deceased individuals' wills had known them for twenty years and met with them to discuss their respective wills. 2014 WL 1672984, at *1. Petitioner claims that here, on the other hand, the decedent "did not have the luxury of discussing her will with an attorney of her choice."

When undue influence is asserted, "to avoid a will, [it] must be such as overcomes the free agency of the testator at the time of actual execution of the will." Syl. Pt. 10, in part, *James v. Knotts*, 227 W. Va. 65, 705 S.E.2d 572 (2010) (citation omitted). A will will not be set aside "on

---

[3] We have held that

> [t]he standard of review applicable to an appeal from a motion to alter or amend a judgment, made pursuant to W. Va. R. Civ. P. 59(e), is the same standard that would apply to the underlying judgment upon which the motion is based and from which the appeal to this Court is filed.

Syl. Pt. 1, *Wickland v. Am. Travellers Life Ins. Co.*, 204 W. Va. 430, 513 S.E.2d 657 (1998).

evidence tending to show only a possibility or suspicion of undue influence." *Id.*, syl. pt. 12, in part (citation omitted).

Moreover,

[t]he will of a testator of sound mind will not be set aside without clear proof of fraud, duress, coercion or undue influence exerted by the beneficiary or other person to procure its execution. Mere opportunity to exert such influence, or proof of facts tending to create suspicion with respect thereto, is not sufficient.

Syl. Pt. 6, *Ebert v. Ebert*, 120 W. Va. 722, 200 S.E. 831 (1938). Undue influence may be established by circumstantial evidence, but when circumstantial evidence is used, "the established facts must be inconsistent with any theory other than that of undue influence." Syl. Pt. 19, *Ritz v. Kingdon*, 139 W. Va. 189, 79 S.E.2d 123 (1953), *overruled on other grounds by* syl. pt. 6, *State v. Bragg*, 140 W. Va. 585, 87 S.E.2d 689 (1955).

Contrary to petitioner's characterization, there is no evidence that respondent "actively procured" the decedent's will. Although respondent contacted Mr. Wilson and facilitated its preparation, she did not direct the contents of the will. As this Court stated in *Vaupel*, it would have been "more appropriate" for the decedent to choose her attorney, but as also found in *Vaupel*, this fact alone does not establish undue influence. *See* 194 W. Va. at 299, 460 S.E.2d at 434. Petitioner offers no evidence that respondent, in contacting Mr. Wilson, did anything more than assist the decedent with obtaining a will that disposed of her property as she desired. Rather, the evidence from Mr. Wilson and the caretakers who witnessed the decedent execute her will was that respondent was not present for the will's execution or Mr. Wilson's meeting with the decedent to discuss the will, that the decedent was of sound and disposing memory when she executed the will, and that the decedent clearly expressed her intention that respondent receive the decedent's home and the reason for that disposition. In light of this evidence, petitioner's assertion that respondent contacted Mr. Wilson to assist the physically frail decedent with obtaining a new will is insufficient evidence of undue influence to withstand summary judgment.

Additionally, when asked about the evidence of undue influence he possessed, petitioner offered only the following during his deposition:

Q.  Okay. What evidence do you know of that [respondent] engaged in some sort of undue influence on your mother to get her to change the will?

A.  The only person who ever said anything about the house was her. Two years before—before dad died, that was the only thing to come out of her mouth. My mom never discussed—everything was divided equally.

Q.  But do you know of anything that—any evidence? Has anybody told you anything or do you know of anything you can point to say that [respondent] had influenced your mother?

5

A.    There's one good thing that [respondent] did, she's greedy. She's greedy. She lives beyond her means. She's a schoolteacher. She wants to be a—she can't buy her clothes in Clarksburg, like I buy them at Gab's. She has to go to Pittsburgh and buy her clothes, because she don't want anybody to run into her with the same outfit, or her kids. She's a spoiled brat.

Q.    All right. Anything else that you know of?

A.    She sure conned me. She sure did a good job on this dummy.

Q.    Okay. Is there—do you know of any—is there anything else that you can point to say that she engaged in undue influence?

A.    Well, she—she got that will changed, didn't she? . . . And she wanted to have a car. And she said that the car was supposed to be mine. And it was mine. Why is that in the will? Because [respondent] wanted it in there to blackmail me with. I told you how she blackmailed me with that car. . . .

Q.    Okay. Anything else you can point to, to say that she engaged in undue influence?

A.    She got that will changed that she called over there and told them what she wanted to put in there.

Q.    You said that, the will was changed.

A.    Oh, no. Mr. Wilson said that she called over and told them what mom said to put in the will. Who was present there when mom—this is [respondent's] fake will, like fake news.

She just wanted it all. And she said, Oh, I'd just like to stop. I knew that he would get mad. I really didn't want—all she had to do was tear that will up.

And she didn't know I was going to get mad. She just didn't realize I would hire a lawyer to take care of this. . . .

Q.    Okay. Anything else?

A.    No.

This is also insufficient as "[u]ndue influence cannot be based on suspicion, possibility or guess that such undue influence has been exercised, but must be proved and the burden of proof of such issue rests on the party alleging it." Because petitioner can point to no evidence of undue influence "such as overcomes the free agency of the testator at the time of actual execution of the will," *James*, 227 W. Va. at 68, 705 S.E.2d at 575, syl. pt. 10, in part, we find no error in the court's grant of summary judgment on this claim.

In petitioner's second assignment of error, he argues that the decedent was of unsound mind at the time that she executed the will. Petitioner highlights Dr. Fryer's 2013 finding of incapacity and other medical records documenting the decedent's Alzheimer's disease and short-term memory loss.

West Virginia Code § 41-1-2 provides that "[n]o person of unsound mind, or under the age of eighteen years, shall be capable of making a will." But "[m]erely because a testator may be incompetent to safely transact the general business affairs of life does not render him incompetent to make a will," syl. pt. 8, *Stewart v. Lyons*, 54 W. Va. 665, 47 S.E. 442 (1903), as "[g]reater mental capacity is required to execute a deed or contract than a will." Syl. Pt. 4, *Prichard v. Prichard*, 135 W. Va. 767, 65 S.E.2d 65 (1951). Further,

> "[i]t is not necessary that a testator possess high quality or strength of mind, to make a valid will, nor that he then have as strong mind as he formerly had. The mind may be debilitated, the memory enfeebled, the understanding weak, the character may be peculiar and eccentric, and he may even want capacity to transact many of the business affairs of life; still it is sufficient if he understands the nature of the business in which he is engaged when making a will, has a recollection of the property he means to dispose of, the object or objects of his bounty, and how he wishes to dispose of his property." Syllabus Point 3, *Stewart v. Lyons*, 54 W.Va. 665, 47 S.E. 442 (1903).

*James*, 227 W. Va. at 68, 705 S.E.2d at 575, syl. pt. 6.

"The time to be considered in determining the capacity of the testator to make a will is the time at which the will was executed," *id.*, syl. pt. 8 (citation omitted), and in making the determination,

> [t]he evidence of attesting witnesses, of attending physicians, and of a lawyer who drafted the will, is entitled to great weight on the question of mental capacity of a testator to make a will. Although such evidence in favor of a will is not conclusive, it must be clearly outweighed by other evidence in order to support a verdict against the validity of the will.

Syl. Pt. 3, *Floyd v. Floyd*, 148 W. Va. 183, 133 S.E.2d 726 (1963).

Dr. Fryer's determination and the other medical records are insufficient to create a triable issue. Dr. Fryer's determination of incapacity was made in 2013, whereas the will was executed in 2016. Likewise, the other medical records were not completed contemporaneously with the will's execution. As stated above, the relevant timeframe for determining soundness of mind is when the decedent executes the will. Moreover, Mr. Wilson's and the caregivers' testimony, which were entitled to "great weight," was that the decedent understood that she was executing a will that, among other things, devised her home to respondent, and the decedent informed Mr. Wilson and the attesting witnesses of the reason for her decision.

7

Assuming petitioner properly authenticated the medical records, they do not speak to the decedent's capacity at the time the will was executed. In fact, they do not speak to testamentary capacity at all. Given that a testator need not "possess high quality or strength of mind" and that a testator's mind may be "debilitated" and memory "enfeebled," the records do not raise a question as to the decedent's recollection of her property or her intention to devise her home to respondent on the day the will was executed, as testified to by Mr. Wilson and the decedent's caretakers. Likewise, Dr. Fryer's 2013 determination that the decedent was unable "because of physical or mental impairment to appreciate the nature and implications of a health care decision, to make an informed choice regarding the alternatives presented, and to communicate that choice in an unambiguous manner," West Virginia Code § 16-30-3(l), does not, here, establish a lack of testamentary capacity, particularly where it has long been the case that one "may even want capacity to transact many of the business affairs of life" and, yet, possess testamentary capacity. *James*, 227 W. Va. at 68, 705 S.E.2d at 575, syl. pt. 6, in part.

In petitioner's final assignment of error, he claims that the circuit court erred in granting summary judgment in respondent's favor on his tortious interference with a testamentary bequest claim.[4] Petitioner claims that "[b]y controlling the execution and preparation of her mother's will," respondent tortiously interfered with a testamentary bequest. Under these facts, we agree with the circuit court's conclusion that petitioner's inability to prove undue influence as a matter of law renders summary judgment on his tortious interference with a testamentary bequest claim appropriate. Because petitioner's tortious interference claim is predicated on respondent's alleged undue influence over the decedent in contacting Mr. Wilson, and because we found that such conduct is insufficient to establish undue influence, petitioner's tortious interference claim likewise fails. *See Printz*, 2014 WL 1672984, at *4 (finding no error in the circuit court's conclusion that "inasmuch as she could not prove undue influence as a matter of law, then her tortious interference claim must also fail" as it was "premised entirely upon her allegations of undue influence").

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** January 13, 2020

**CONCURRED IN BY:**

Chief Justice Tim Armstead
Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Evan H. Jenkins
Justice John A. Hutchison

---

[4] "An intended beneficiary may sue for tortious interference with a testamentary bequest." Syl. Pt. 2, *Barone v. Barone*, 170 W. Va. 407, 294 S.E.2d 260 (1982).